**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph WHITE, Defendant–Appellant.**

**No. 91–3935.**

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1992.

Decided Nov. 9, 1992.

R. Jeffrey Wagner, Asst. U.S. Atty., Stephen A. Ingraham, Asst. U.S. Atty. (argued), Milwaukee, Wis., for plaintiff-appellee.

Michael J. Backes (argued), Milwaukee, Wis., for defendant-appellant.

Before FLAUM and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

Joseph White met Doris Ann McLeod on a bus trip in December 1990. McLeod was then 16 years old and living at a group home in Decatur, Illinois. Over the next month, White called McLeod several times to persuade her to run away with him. On the night of January 13, McLeod climbed out of a window in the home and met White at a convenience store. The two then traveled to Springfield, where White arranged for McLeod to work as a prostitute. She was arrested shortly thereafter and returned to the group home in Decatur.

In February 1991, McLeod again ran away with White. This time the pair proceeded to Milwaukee, where White again set up McLeod as a prostitute. The last time White saw her alive, McLeod and another man were entering a car. On February 23, McLeod's dead body was found in a public hunting ground in Dane County, Wisconsin.

White was arrested on June 18, and his apartment was searched by police with the consent of his wife, Elaina. A state court commissioner held a probable cause determination on the day after White's arrest, although his federal indictment did not issue until six days later. At the conclusion of a jury trial, White was found guilty of interstate transportation of a minor for the purpose of prostitution, in violation of 18 U.S.C. § 2423. At sentencing, the district court determined that White's base offense level was 16. The court enhanced the offense level to 18 to reflect McLeod's status as a vulnerable victim under § 3A1.1 of the Sentencing Guidelines. Finally, the court departed upward because of McLeod's death and sentenced White to the maximum statutory term of 10 years. White now challenges his conviction and his sentence. We affirm.

I.

White first maintains that evidence obtained during the June 18 search of his

apartment should have been suppressed because consent to the search was not given voluntarily. On that morning, Milwaukee police arrived at White's residence to place him under arrest. After taking him into custody, one of the detectives asked Elaina White, James' wife, for consent to search the apartment. She granted consent by writing a short statement in an officer's memo book. The search turned up a bus baggage receipt filled out in one of White's assumed names, and a legal pad containing gang rules and an apparent transcript of a meeting at which White proposed that McLeod work as a prostitute for her gang initiation. White contends on appeal that Elaina was not advised of her right to refuse to grant consent to the search, and that the police threatened to obtain a search warrant if she would not allow them in.

A warrantless search is permissible if police receive consent that is voluntarily given. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether consent is given voluntarily depends on "the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2048. The government bears the burden of showing voluntariness by a preponderance of the evidence, *id.* at 222, 93 S.Ct. at 2045, and we will not reverse a district court's finding on this issue unless it is clearly erroneous. *United States v. Duran,* 957 F.2d 499, 502 (7th Cir.1992); *United States v. Talkington,* 843 F.2d 1041, 1047 (7th Cir.1988).

White's first ground for contesting voluntariness fails. Even if Elaina White was not informed of her right to refuse to grant consent for the search, the Supreme Court in *Schneckloth* held that any such requirement of a warning "would be thoroughly impractical to impose on the normal consent search." *Schneckloth,* 412 U.S. at 231, 93 S.Ct. at 2050. The lack of a warning does not prove that consent was involuntary; it is simply another factor to be considered in the "totality of circumstances." *Id.*

White's second ground fails as well. Baseless threats to obtain a search warrant may render consent involuntary. *See Talkington,* 843 F.2d at 1049. When the expressed intention to obtain a warrant is genuine, however, and not merely a pretext to induce submission, it does not vitiate consent. *See Duran,* 957 F.2d at 502; *United States v. Colonia,* 870 F.2d 1319 (7th Cir.1989). In this case, no evidence was shown that the police intended to coerce Elaina by empty threat.[1] Moreover, as the Magistrate noted, Elaina later stated that she did not remember having any conversation with officers about search warrants. Although one officer testified that the conversation did occur, Elaina's failure to recall it indicates its lack of coercive influence.

Viewing the situation as a whole, we find that the district court did not clearly err in concluding that Elaina White freely consented to the search of her residence. Although no warning of her right to refuse consent was given, the promise that the police would obtain a search warrant if she refused implicitly communicated the option to her. Furthermore, Elaina White was unrestrained in the living room of their apartment and not in custody at the time of the encounter; there is no evidence that her will was overborne. The fruits of the search, in any case, were duplicative of other testimony and evidence that White transported McLeod across state lines for the purpose of prostitution. Any error in their admission was thus harmless.

## II.

White next contends that a statement he made on June 20 to police while in custody should have been suppressed because he was not promptly arraigned. White was arrested and interviewed on June 18. A probable cause determination, at which White was not present, took place before a Wisconsin court commissioner on June 19. The following day, bail was set and police

---

1. Police obtained a search warrant for another search of the residence on the following day.

officers conducted a second interview. On June 24, White spoke to a public defender, who filed a petition for a writ of habeas corpus on June 25. That same day, White was indicted by a federal grand jury, was transferred to federal custody, and made his first appearance in federal court.

The traditional rule of *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), required that defendants be taken before a judicial officer "without unnecessary delay" after arrest for a determination of probable cause. Failure to do so would cause statements made in custody to be suppressed. Congress subsequently enacted 18 U.S.C. § 3501 to provide that voluntary confessions made within six hours of arrest are not inadmissible solely on account of any delay in the appearance before a magistrate. 18 U.S.C. § 3501(c) (1988).

■ White relies on *United States v. Carter*, 910 F.2d 1524 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991), for the proposition that time spent in state custody counts toward the six-hour limitation if a "working arrangement" between state and federal officials to delay the defendant's appearance before a federal magistrate can be " 'clearly shown'." *Id.* at 1528. The defendant has the burden of demonstrating such collusion. *United States v. Gaines*, 555 F.2d 618, 625 (7th Cir.1977). White argues that the timing of the issuance of the federal indictment—the same day that his attorney filed a writ of habeas corpus—makes it "obvious that federal and state authorities conferred" sometime prior to June 25. Even if this is true, there is no evidence that there was any working arrangement as of June 20, when the statement White sought to have suppressed was made. White falls far short of meeting his burden to show that state custody was "designingly utilized" to circumvent the prompt hearing requirement. *Gaines*, 555 F.2d at 625 (quoting *United States v. Chadwick*, 415 F.2d 167 (10th Cir.1969)).

■ White contends that his June 20 statement was nevertheless involuntary. Pointing to the same chronology of events, and complaining that he did not enjoy the benefit of counsel at questioning, White claims that admission of the statement violated his Fifth Amendment rights. The test for the voluntariness of a confession is whether the totality of circumstances indicate that the statement was freely made. *United States v. Cahill*, 920 F.2d 421, 427 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2058, 114 L.Ed.2d 463 (1991); *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047. The ultimate issue of voluntariness is a legal question subject to *de novo* review. *Cahill*, 920 F.2d at 427.

The Magistrate found that White was fully advised of his *Miranda* rights prior to his interrogations on June 18 and June 20, despite White's testimony to the contrary. Indeed, the Magistrate concluded that White chose to cooperate with police precisely in order to remove himself from suspicion for McLeod's murder. On appeal, White offers no evidence, other than the sheer duration of his custody, to suggest that his confession was involuntary. At the time of the June 20 statement, however, White had been in custody only 58 hours and had received a probable cause determination and a bail hearing. Under these circumstances, we believe the court properly found the June 20 confession to be voluntary and admissible.

■ We note in passing that any error in the admission of the statement was surely harmless. *Arizona v. Fulminante*, — U.S. —, —, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). In his statement to police on June 18, the admission of which defendant does not challenge, White had already admitted arranging for McLeod to run away with him to Milwaukee and watching her and a man enter a car in an area of the city known for prostitution. The June 20 statement only elaborated on the details. The introduction of the later statement was thus unlikely to have affected the outcome of the case.

### III.

White raises two challenges to his sentence. First, he contends that the court erroneously applied a 2–level enhancement to reflect the vulnerability of his victim. Section 3A1.1 of the Sentencing Guidelines directs:

> If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

Application Note 2 of § 3A1.1 prescribes that the vulnerable victim adjustment should not be applied where the offense guideline specifically incorporates the same victim-related factor. White argues that § 2G1.2, the offense guideline for transportation of a minor for the purpose of prostitution, already takes into account vulnerability on the basis of age. The district court, however, expressly found that the victim was a "vulnerable," "emotionally disturbed," and "frightened" teenage girl who was "particularly susceptible to the type of luring that was offered to her." Sent. Tr. at 6. There was considerable evidence before the district court that McLeod was a vulnerable victim on account of her troubled childhood and history of sexual abuse, and that White knew that she lived in a group home. Because these factors were not related to her age, the 2–point enhancement was appropriate.

Second, White contests the district court's upward departure to the maximum statutory term for his offense. The court found that the calculated offense level of 18 understated the seriousness of White's offense because it did not take McLeod's death into account. Following the Government's suggestion in its sentencing memorandum, the court departed from the guideline range and treated White's offense as if it had an offense level of 28, a figure partway between the offense level of 25 for voluntary manslaughter, see § 2A1.3(a), and the level of 33 for second-degree murder, see § 2A1.2(a). Combined with a criminal history category of III, offense level 28

yields a sentence of 97 to 121 months— effectively tripling the original range.

Authorization for this departure stems from guidelines 2G1.2 and 5K2.1. Application Note 2 to § 2G1.2, the relevant offense guideline in this case, indicates that "[i]f bodily injury results, an upward departure may be warranted." Policy statement 5K2.1 provides:

> If death resulted, the court may increase the sentence above the authorized guideline range.
>
> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other ... guidelines, already reflects the risk of personal injury.

The district court did not explicitly refer to either guideline in announcing its decision to depart. The court did, however, make the following findings in justification of the departure:

> I want to make it clear, Mr. White, I'm not going to sentence you because you murdered this young woman. You might have. Maybe you did, maybe you didn't. I don't know. There is no or even sufficient evidence for me to conclude at this time on this record that you did. ... But you put into motion a scenario that had the inevitable tragic result that this one did. By putting this young emotionally disturbed teenage runaway without any direction in her life on the streets, meeting the kind of characters that one can meet in that situation, in my view was foreseeable that she could end up like she did. Maybe not with her

hands mutilated, but certainly her death was [sic] under that circumstance is not an unexpected event.

Sent. Tr. at 26.

The gravamen of White's objection on appeal is that McLeod's death was not a reasonably foreseeable outcome of the crime for which he was convicted, interstate transportation of a minor for the purpose of prostitution. White maintains that he did not know the person who last picked up McLeod, that no evidence of other murders of prostitutes in Milwaukee has been shown, and that he did not intend or knowingly risk her death. Analogously, White argues that a departure for resulting death is only justified when the act itself—in this case, the transportation—directly yields that result. For these reasons, he argues, the district court's stated grounds do not justify an upward departure. *United States v. Gaddy*, 909 F.2d 196, 198–99 (7th Cir.1990).

The closest case involving issues of intent and foreseeability in support of a § 5K2.1 departure is *United States v. Rivalta*, 892 F.2d 223 (2d Cir.1989), *cert. denied*, — U.S. —, 112 S.Ct. 215, 116 L.Ed.2d 173 (1991). The defendants in *Rivalta* were two brothers who conceived a scheme to swindle diamonds from a naive diamond-dealer, Barbara Mangiameli, by persuading her that they could arrange a purchase by a diplomat. A transfer of the diamonds took place, and the Rivaltas promptly left for Florida in a rented car. Mangiameli was last seen on the day of the exchange; her body was found four months later floating in Manhattan harbor. A jury convicted the Rivaltas of interstate transportation and sale of the stolen diamonds. The district court then departed upward from the calculated guideline ranges to reflect Mangiameli's death and imposed two consecutive ten-year sentences on each brother. The court made the departure despite the absence of any evidence that the Rivaltas had killed her.

On appeal, the Second Circuit held that a preponderance of the evidence would support the finding that Mangiameli's death resulted from the activities of the Rivaltas. It noted, however, that the district court had only concluded that there was a "nexus" between "the disappearance of the deceased and the disappearance of the diamonds." *Id.* at 232. That finding was insufficient under § 5K2.1. To justify an upward departure, the district court must determine that "the Rivaltas '*intended*' or '*knowingly risked*' Mangiameli's death." *Id.* (citing § 5K2.1). Accordingly, the appellate court remanded for further findings.[2]

■ We follow the Second Circuit in requiring that § 5K2.1 departures be supported by findings that death was intentionally or knowingly risked. By setting forth this standard, the Sentencing Commission indicated that such departures are appropriate only when the defendant is actually aware that a fatal outcome is likely. *See Model Penal Code* § 2.02 (1985); *United States v. Bader*, 956 F.2d 708, 710 (7th Cir.1992). Unlike *Rivalta*, however, we hold that the district court in this case implicitly found that the defendant knowingly risked his victim's death. The court stated that White "put into motion" a chain of events that contained an "inevitable tragic result"; it added that putting McLeod on the street as a "young emotionally disturbed teenage runaway without any direction in her life" made it "foreseeable that she could end up like she did." While more explicit findings would aid the process of review, especially in the case of a 10–level upward departure, we have no doubt that the district court believed McLeod's death was "knowingly risked."

For the foregoing reasons, White's conviction and sentence are AFFIRMED.

---

**2.** On remand, the district court did find that the defendants had intended or knowingly risked their victim's death. The Second Circuit af-

firmed. *United States v. Rivalta*, 925 F.2d 596 (2d Cir.1991).