UNITED STATES of America,
Plaintiff–Appellee,

v.

Kenneth G. MONTGOMERY,
Defendant–Appellant.

No. 92–2153.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1993.

Decided Jan. 24, 1994.

James Porter, Asst. U.S. Atty., Margaret Mary Robertie (argued), Office of U.S. Atty., Crim. Div., Fairview Heights, IL, for plaintiff-appellee.

Carol J. Reid, Springfield, IL (argued), for defendant-appellant.

Before CUMMINGS, COFFEY, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Kenneth G. Montgomery was convicted by a jury on two counts of possession with the intent to distribute cocaine base (or crack cocaine) in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Montgomery to a concurrent term of 240 months in prison on each of the two counts of conviction. Montgomery appeals, challenging the admission of his confession at trial as well as the sentence he received under the Sentencing Guidelines. We affirm Montgomery's convictions but vacate his sentence and remand for resentencing.

## I. FACTS

On April 24, 1991, Patches Holmes, an undercover operative with the St. Clair County Sheriff's Department Tactical Unit, purchased a sixteenth-ounce piece of crack cocaine from Montgomery. Because the transaction occurred at Montgomery's residence, the authorities obtained a warrant to search the premises, and they executed the warrant at 6:30 a.m. on April 26, 1991. Upon entering the residence, the Sheriff's deputies

found Montgomery in bed holding a .357 magnum revolver, although he dropped the weapon when ordered to do so. The deputies found Montgomery's wife Lisa, who was approximately eight months pregnant, in the bedroom closet, where she apparently had hidden after hearing the officers. The deputies seized a small quantity of marijuana, a beeper, Montgomery's revolver, and some gold jewelry.

Montgomery and his wife were taken to the local jail and placed in separate interview rooms. Lisa Montgomery underwent a medical examination, and she was then interviewed by Captain Terry Delaney and Deputies David Clark and Glenn Haas of the St. Clair County Sheriff's Department. Lisa signed a statement for the officers in which she acknowledged that her husband had been dealing drugs, although not on a large level. She was subsequently released.

Montgomery was held in a separate interview room for almost seven hours before he made a statement. At 1:40 p.m., Montgomery signed a typewritten form acknowledging that he had read and understood his *Miranda* rights and agreeing to submit to questioning by the officers. Montgomery then requested that they move to a more private location, and the officers moved Montgomery to a private office. There, Montgomery signed a "voluntary statement" admitting that he had "been dealing drugs for six months," that he supplied street-level dealers with "16 balls" of crack cocaine, and that he did not "front anyone." Montgomery also described in the statement how he "cooked" and sold cocaine and stated: "I sell about 2 oz. of cocaine every other day. But now I sell about 2 oz. a week." State authorities subsequently decided not to charge Montgomery, and he was released.

Holmes purchased crack cocaine from Montgomery a second time on October 3, 1991. Holmes went to Montgomery's residence with Deputy Johnnie Singleton, who also was acting undercover. Holmes and Singleton spoke to Montgomery and an unidentified man in Montgomery's driveway. As Holmes was counting money for Montgomery's companion, an argument ensued over whether Holmes was being shorted in the sale. Montgomery then placed the cocaine in a toolbox and directed that Holmes pay another unidentified man who was waiting in a nearby automobile. Once that man signaled that Holmes' payment was in order, Montgomery permitted Holmes to retrieve the cocaine from the toolbox.

Montgomery was indicted on October 23, 1991. Count I charged a conspiracy between Montgomery and four unindicted co-conspirators to distribute in excess of fifty grams of crack cocaine; count II charged that Montgomery had possessed with the intent to distribute 1.1 grams of crack cocaine on or about April 24, 1991; and count III charged possession with the intent to distribute 3.0 grams of crack cocaine on or about October 3, 1991. The government subsequently dismissed the conspiracy count and proceeded to trial only on the possession counts.

Prior to trial, Montgomery moved to suppress the written statement he had provided while in custody on April 26, 1991. He argued that the statement had not been voluntary because he made it while under the influence of crack cocaine. Montgomery also maintained that he made the statement only to gain his release because he was worried about the condition of his pregnant wife and needed more cocaine. The district court held an evidentiary hearing and then denied the motion, concluding that Montgomery's statement was voluntarily given. The court found that Montgomery was not a credible witness and noted that, despite his apparent drug problem, there was no indication that Montgomery was incapacitated when he made the statement.

At trial, Montgomery asserted that Kevin Marston, his brother-in-law, had sold the crack cocaine to Holmes and that he had signed the April 26, 1991 statement only to protect Marston. The jury apparently rejected this story and found Montgomery guilty on both remaining counts.

The district court conducted a sentencing hearing on May 8, 1992, at which two issues were contested: (1) whether Montgomery should receive a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possessing a firearm during the commission of a drug

trafficking offense, and (2) whether the cocaine sales referenced in Montgomery's April 26, 1991 statement constituted "relevant conduct" for purposes of calculating Montgomery's base offense level. The district court first found that application of the firearm enhancement was appropriate because Montgomery had possessed the gun during the period that he was dealing cocaine. The court then found that the government's evidence at the sentencing hearing corroborated Montgomery's written statement that he had been dealing drugs for approximately six months and that he had sold about two ounces of cocaine every other day, but now about two ounces a week. The court further found that the transactions described in the statement were part of the same course of conduct as the offenses of conviction and that they therefore constituted "relevant conduct" for sentencing purposes under U.S.S.G. § 1B1.3(a)(2). Assuming that Montgomery had been selling cocaine for six months and assuming four weeks to every month, the district court concluded that Montgomery had admitted to twenty-four weeks of cocaine dealing. The court then assumed the sale of two ounces every week for twenty-four weeks, meaning that Montgomery would have sold forty-eight ounces of cocaine base over the six-month period covered by his confession. The court then converted the forty-eight ounces to 1,360.78 grams, added the 4.1 grams involved in the offenses of conviction, and determined that Montgomery should be sentenced on the basis of 1.364 kilograms of crack cocaine. This resulted in a base offense level of 38 under U.S.S.G. § 2D1.1(a)(3), which, when coupled with his criminal history category of I, resulted in a range of between 235 and 293 months incarceration. The court sentenced Montgomery to a concurrent term of 240 months on both counts of conviction, to be followed by five years of supervised release. Montgomery appeals his convictions and sentence.

## II. DISCUSSION

### A. Suppression of the April 26, 1991 Statement

Montgomery first challenges the district court's denial of his motion to suppress the April 26, 1991 statement. The statement is in the handwriting of Deputy David Clark of the St. Clair County Sheriff's Department, but Clark testified that the words were Montgomery's own. Montgomery initialed both the beginning and end of each page and then signed his full name at the bottom of the statement, which reads as follows:

I been dealing drugs for six months. I supply street level dealer with 16 balls. I don't front anyone.

I got my cocaine in powder from a guy name Steve. I believe Steve get it from a guy name Moe. Steve can be reach at 782–0087. Steve be at a white house on 41st; between the driveway is a tree that separate the driveway of two white houses.

Steve then walks across the street and gets the cocaine. Steve goes into a brown house with lots of trees or bushes along the driveway. This guy Moe drives a brown Lincoln.

When I get 2 oz. of powder cocaine I would cook it myself. I would go to the Graystones apartment and promise someone a twenty dollar piece if they would let me use their stove to cook it on.

I would drive around in my truck with the drugs on me. I would get beeped and then meet with the person and transact business.

The truck is mine. I bought it from "D" Delois Gaitor back October or September of last year.

I sell about 2 oz. of cocaine every other day. But now I sell about 2 oz. a week. I pay about $3,000.00 for 2 oz. and make about 40 16 oz. balls.

I've also dealt with Major Bailey when I could get any good coke from my guys.

In moving to suppress, Montgomery argued that the statement was not freely and voluntarily made. He maintained that the officers who took the statement promised that both he and his wife would be released once he made a statement. The officers also allegedly told Montgomery that he and his wife would be heading to jail for a long time, that his baby probably would be born in jail, that his children would then be taken from him, and that he and his wife could be evict-

ed from their home. Moreover, Montgomery suggested that, given his concern for his pregnant wife and his need for additional cocaine, he would have done anything to obtain his freedom.

The district court held an evidentiary hearing on January 3, 1992. The three officers who were present when Montgomery made his statement testified for the government, and each explained that Montgomery had not appeared to be under the influence of drugs or alcohol when he made the statement. The officers also denied making any promises to induce, Montgomery's statement, although they acknowledged that Montgomery had expressed concern for his pregnant wife. Montgomery then countered with the testimony of his mother, brother, and wife, and each stated that Montgomery was a cocaine addict who had become moody and was frequently not himself. Montgomery also testified that he would have done or said anything to be released.

The district court denied the suppression motion in a written opinion. The court credited the officers' testimony that Montgomery had not appeared to be under the influence of drugs or alcohol and that he had appeared "normal" and "not groggy." The court found that although Montgomery obviously had a drug problem, there was no credible evidence that he had been incapacitated when he gave the statement. The court similarly found no credible evidence of coercion by the interrogating officers. Indeed, the court specifically found that Montgomery had not been a credible witness at the suppression hearing.

■■■■ In reviewing a refusal to suppress a statement or confession as involuntary, we accept the district court's factual findings unless clearly erroneous. *United States v. McGuire,* 957 F.2d 310, 315 (7th Cir.1992); *United States v. Haddon,* 927 F.2d 942, 945 (7th Cir.1991). Where the court's decision follows an evidentiary hearing that generates conflicting evidence, we must defer to the credibility assessments of the district judge who viewed the witnesses and heard their testimony. *United States v. Chrismon,* 965 F.2d 1465, 1470 (7th Cir.1992); *Haddon,* 927 F.2d at 945. Despite the deference we accord to the lower court's factual findings and

credibility assessments, we must independently evaluate the ultimate question of voluntariness, as it is one of law subject to review de novo. *United States v. White,* 979 F.2d 539, 543 (7th Cir.1992); *United States v. Church,* 970 F.2d 401, 403–04 (7th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993); *McGuire,* 957 F.2d at 315.

■■■■ Our cases explain that "[a] confession will be adjudged 'voluntary' if the government demonstrates that under the totality of the circumstances and by a preponderance of the evidence that it was not secured through psychological or physical intimidation but rather was the 'product of a rational intellect and free will.'" *Haddon,* 927 F.2d at 945 (quoting *United States v. Holleman,* 575 F.2d 139, 142 (7th Cir.1978)); see also *United States v. Buckley,* 4 F.3d 552, 559 (7th Cir.1993), cert. denied —— U.S. ——, 114 S.Ct. 1084, 127 L.Ed.2d 400 (1994); *McGuire,* 957 F.2d at 315. The crucial question is whether " 'the defendant's will was overborne at the time he confessed' " (*United States v. Hocking,* 860 F.2d 769, 774 (7th Cir.1988) (quoting *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963)); see also *McGuire,* 957 F.2d at 315; *Haddon,* 927 F.2d at 945–46; *United States v. Fazio,* 914 F.2d 950, 956 (7th Cir. 1990)), and the answer lies in whether the authorities obtained the statement through coercive means. *Buckley,* 4 F.3d at 559 (citing *Colorado v. Connelly,* 479 U.S. 157, 166–67, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986)). We consider the issue of official coercion from the perspective of a reasonable person in the defendant's position at the time of the statement. *Haddon,* 927 F.2d at 946; *Fazio,* 914 F.2d at 955. We look both to "the characteristics of the accused and the details of the interrogation" in determining whether a reasonable person would feel coerced. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). We specifically consider "the age of the defendant, his lack of education or low intelligence, the lack of any advice to him of his constitutional rights, the length of his detention, the repeated and prolonged nature of the questioning, and the use of physical

punishment." *Pharr v. Gudmanson,* 951 F.2d 117, 120 (7th Cir.1991); *see also Church,* 970 F.2d at 404.

■ Montgomery initially argues that the district court should not have relied on the officers' assessments that he was not under the influence of alcohol or drugs. Montgomery labels their views "unreliable" and asserts that the court should have looked instead to the testimony of his mother, brother, and wife, which indicated that Montgomery was a cocaine addict who was prone to abnormal behavior. Montgomery essentially asks that we disregard the credibility assessments of the district court, but the record provides no basis for doing so here. Although Montgomery may have been a cocaine addict, the three officers all indicated that he had not appeared to be under the influence of alcohol or drugs when he offered the statement. The officers, after all, were present during the interrogation, whereas Montgomery's relatives were not.[1] We thus defer to the district court's finding that there was no credible evidence suggesting that Montgomery lacked the capacity to make a voluntary statement.

■ Yet, even if we were to assume that Montgomery was a cocaine addict who may have been incapacitated, we would not necessarily conclude that the statement was involuntary because there still must be some showing of official coercion. *See Connelly,* 479 U.S. at 167, 107 S.Ct. at 522 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' "). A diminished mental state due to the effects of alcohol or drugs "is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *Chrismon,* 965 F.2d at 1469; *see also Bae v. Peters,* 950 F.2d 469, 475 (7th Cir.

1991); *Andersen v. Thieret,* 903 F.2d 526, 530 n. 1 (7th Cir.1990) (the defendant's "intoxication by itself could not support a finding of involuntariness and is relevant only to the extent it made him more susceptible to mentally coercive police tactics"). We explained in *Haddon* that "when the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." 927 F.2d at 946; *see also Smith v. Duckworth,* 910 F.2d 1492, 1497 (7th Cir.1990). Even assuming that Montgomery may have been functioning with limited capacity here, we find no evidence of coercion that would be sufficient to render Montgomery's statement involuntary.

Montgomery now concedes that the officers made no promises to coerce his statement.[2] Instead, he maintains that they used psychological intimidation when they separated him from his pregnant wife for over seven hours. Montgomery argues that his concern for his wife's safety, as well as his craving for additional drugs, led him to concoct a confession in order to gain his freedom.

Our independent evaluation of the record reveals no support for Montgomery's theory that the officers coerced his statement. Before taking the statement, the officers read Montgomery his *Miranda* rights and obtained his signature on a statement waiving those rights. The officers also did not indicate to Montgomery that either he or his wife would be released once he provided a statement, nor did they promise leniency of any sort in return for Montgomery's cooperation. Thus, to the extent that Montgomery may have believed the statement would result in his release, that belief was not fos-

---

1. Although Lisa Montgomery had been with her husband when the Sheriff's deputies executed the search warrant, she had been separated from him for almost seven hours by the time he made his statement.

2. In fact, he argues that the lack of affirmative promises actually supports his position because it somehow indicates the existence of other coercive activity:

 The very fact that no promises were made to the defendant is an indication that there was coercion in other respects, outside of promises.

It is unreasonable to think that the defendant just nonchalantly strolled into the interrogation room and agreed to cooperate with the authorities, strictly for the sake of conversation.... It's more reasonable to believe that after sitting alone in his cell for hours, anguishing after the safety of his pregnant wife and craving more drugs, the defendant may have concocted a plan in his mind to try [to] induce the officers to let him go.

(Montgomery Br. at 23.)

tered by any threats or promises of the interrogating officers.[3] The record, moreover, indicates that Montgomery offered his statement in response to neither prolonged nor particularly vigorous questioning by the officers. Although Montgomery was separated from his wife and held for seven hours, he has not suggested that the conditions of confinement were in any way severe or that he was physically punished. *See McGuire,* 957 F.2d at 315.[4] In the absence of other evidence of official coercion, the seven-hour holding period would not support a finding that Montgomery's statement was coerced. *See White,* 979 F.2d at 543.[5] Considering the totality of the circumstances from the viewpoint of a reasonable person in Montgomery's position, we agree that Montgomery was not coerced into making a statement but that he instead voluntarily confessed his cocaine dealings to the officers. The district court therefore correctly denied Montgomery's motion to suppress the statement.

### B. Sentencing Issues

#### 1. Quantity of Crack Cocaine

Montgomery next argues that the district court erred in utilizing the April 26, 1991 statement to calculate the amount of cocaine for purposes of determining his base offense level under section 2D1.1(a)(3) of the Sentencing Guidelines. Montgomery insists that the court never determined that the statement was accurate, and he contends that it was not reliable because there was no evidence to corroborate it. Montgomery thus maintains that the drug sales referenced in the statement should not have been considered as "relevant conduct" under section

1B1.3(a)(2). He instead argues that he should have been sentenced only on the basis of the 4.1 grams of crack cocaine involved in the April 24 and October 3, 1991 sales.

We will uphold a district court's sentencing decision under the Sentencing Guidelines " 'so long as the district court correctly applied the Guidelines to findings of fact that were not clearly erroneous.' " *United States v. Sykes,* 7 F.3d 1331, 1335 (7th Cir.1993) (quoting *United States v. Duarte,* 950 F.2d 1255, 1262 (7th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992)). The quantity of drugs used to calculate a defendant's base offense level under section 2D1.1 presents a question of fact, and we thus review the district court's determination only for clear error. *United States v. Cedano–Rojas,* 999 F.2d 1175, 1179 (7th Cir.1993); *United States v. Mahoney,* 972 F.2d 139, 141 (7th Cir.1992). Here, the district court included the additional drug sales referenced in the April 26, 1991 statement in calculating Montgomery's base offense level, and we find that it did not clearly err in doing so.

Section 1B1.3(a)(2)[6] "directs that for 'offenses of a character for which § 3D1.2(d) would require grouping of multiple counts,' a defendant's base offense level and specific offense characteristics should take account of 'all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.' " *Sykes,* 7 F.3d at 1335 (quoting U.S.S.G. § 1B1.3(a)(2)). Because section 2D1.1 sets the base offense level for drug trafficking offenses according to the quantity of drugs involved, section 3D1.2(d) would require that

---

3. We are somewhat skeptical that Montgomery even would have entertained such a belief. He confessed to rather significant crack cocaine dealings after having been roused from his residence by officers executing a search warrant. It would have taken considerable foresight on Montgomery's part to think that he would be released, rather than jailed, after making such a confession.

4. Although the record reflects that Montgomery was indeed concerned about his wife, it does not indicate that he ever asked to see her or otherwise attempted to ensure that she was receiving proper care. *Cf. Hocking,* 860 F.2d at 774.

5. Montgomery also does not establish coercion by alleging that the officers told him that he and his wife would be heading to jail for a long time. Montgomery does not assert that such a statement was accompanied by any suggestion that he cooperate by providing the officers with a statement. *Cf. Haddon,* 927 F.2d at 946. Rather, he concedes that no promises were made.

6. Our references to the Sentencing Guidelines in this section are to the 1991 version, which was in effect at the time of Montgomery's sentencing. *See* 18 U.S.C. § 3553(a)(4); *United States v. Harris,* 994 F.2d 412, 416 n. 9 (7th Cir.1993).

Montgomery's two convictions be grouped. *See Cedano–Rojas*, 999 F.2d at 1179 n. 2. Types and quantities of drugs not specified in the counts of conviction could then be considered pursuant to section 1B1.3(a)(2) in determining Montgomery's base offense level. U.S.S.G. § 2D1.1 Application Note 12; *see also United States v. Thomas*, 969 F.2d 352, 355 (7th Cir.) ("The defendant need not have been either charged with or convicted of carrying out these other acts"), *cert. denied*, — U.S. —, 113 S.Ct. 274, 121 L.Ed.2d 202 (1992); *United States v. White*, 888 F.2d 490, 497 (7th Cir.1989). To be considered, the government need only show that the additional sales were part of the "same course of conduct or common scheme or plan" as the offenses of conviction. U.S.S.G. § 1B1.3(a)(2).

Relying on Montgomery's April 26, 1991 statement and on the testimony of the government's witnesses at the sentencing hearing, the district court found that Montgomery had engaged in a series of drug transactions that were part of the same course of conduct as the two sales of conviction. (May 8, 1992 Tr. at 86.) Montgomery admitted in his statement that he had been "dealing drugs for six months" and that he previously had been selling approximately two ounces of cocaine every other day but that he was then selling approximately two ounces every week. He also described how he cooked cocaine powder to make "rocks" and how he drove around in his truck until a prospective buyer "beeped" him on his beeper. The district court found that the government's witnesses verified Montgomery's admissions, and the court therefore included an additional forty-eight ounces (two ounces per week for six months) or 1,360.78 grams of crack cocaine as relevant conduct. The addition of Montgomery's relevant conduct sales to the 4.1 grams from the sales of conviction resulted in a total of 1.364 kilograms of crack cocaine, which the court then utilized to obtain a base offense level of thirty-eight.

Montgomery argues that his statement should not have been considered as evidence of relevant conduct because the district court never found that the statement was reliable and because there was no evidence corroborating it. Although the district court never made a specific finding that Montgomery had accurately described his cocaine operations to the deputies who took his statement, the court obviously believed that Montgomery had been truthful and that he had not merely told the officers what they wanted to hear in the hopes of being released. We will not upset the district court's decision in these circumstances simply because there was not a specific finding that the statement was reliable.

In any event, we believe that the evidence adduced at the sentencing hearing provided sufficient corroboration for Montgomery's statement to render it reliable for sentencing purposes. The government's first witness had watched his friend purchase a "sixteenth" rock from Montgomery, and he stated that during the summer of 1991, he had seen Montgomery on the street selling cocaine almost every day. A second witness attempted to purchase a $20 rock from Montgomery in March or April 1991, but Montgomery directed her to another dealer, saying, as he did in the statement, that he only sold "sixteenths." Another witness described how he had called Montgomery's beeper number on May 26, 1991 in order to purchase crack cocaine, again corroborating Montgomery's statement that he would transact business after being "beeped" by a prospective buyer.[7] The government's evidence thus established that Montgomery was indeed a regular crack dealer and that the two sales of conviction did not reflect the scope of his operations. That evidence corroborated Montgomery's earlier statement, and the district court's decision to rely on the statement in calculating Montgomery's base

---

**7.** A final witness, Daisy Suggs, testified that Montgomery regularly supplied her with cocaine and that she had purchased between 360 and 480 "sixteenths" from him in 1991. However, the district court did not utilize these sales to further enhance Montgomery's sentence because the court found that Suggs had not been a credible witness. Our review of the record indicates that the court did not believe that Suggs had purchased such a large quantity of crack cocaine, although the evidence clearly suggests that she had purchased crack cocaine from Montgomery.

offense level was therefore not clearly erroneous. *See Cedano–Rojas,* 999 F.2d at 1180 (testimony relating to earlier transactions consistent with the defendant's tape-recorded statements referencing earlier transactions); *United States v. Colon,* 961 F.2d 41, 45 (2d Cir.1992) (defendant's admission of additional sales to his probation officer corroborated by the similar characteristics of the sales of conviction).[8]

 Montgomery next argues that the government failed to demonstrate that the additional sales were part of the same course of conduct as the offenses of conviction. We explained in *Cedano–Rojas* that this question "depends upon the similarity, regularity and temporal proximity of the incidents in question." 999 F.2d at 1180; *see also Sykes,* 7 F.3d at 1336. Montgomery maintains that his confession is insufficiently detailed to establish any of these elements, but we disagree. First, the weekly sales referenced in the statement were made in the six months preceding April 26, 1991. The sale charged in count II occurred on April 24, meaning that it was within the relevant six-month period. Moreover, although the sale charged in count III took place over five months later, the government's evidence at sentencing suggested that Montgomery had continued to deal crack cocaine throughout the summer of 1991. The evidence thus established a series of sales that extended beyond the period covered by the confession and that

encompassed both the April 24 and October 3 sales. No temporal proximity problem is posed. *Cf. Cedano–Rojas,* 999 F.2d at 1180–81 (cocaine transactions occurring two years prior to the offense of conviction included as relevant conduct where evidence showed that lapse of time was due to the seller's loss of his supplier and not his abandonment of the earlier course of conduct).

Moreover, the confession itself, as well as the government's evidence at sentencing, indicated both the regularity and similarity of Montgomery's cocaine sales. Although Montgomery presumably sold cocaine to a number of different buyers, including an undercover operative, that distinction is insignificant where the evidence establishes repeated sales of the same quantity of the same substance at approximately the same location through similar means. In short, the evidence plainly established that Montgomery engaged in a pattern of crack cocaine sales that encompassed the offenses of conviction. The additional sales were part of the same course of conduct for purposes of section 1B1.3(a)(2).

*2. Gun Enhancement*

 Montgomery finally challenges the two-level enhancement of his base offense level pursuant to section 2D1.1(b)(1) for possession of a firearm during commission of an offense.[9] He argues that he did not possess

---

**8.** Montgomery also argues that the "rule of lenity" should prevent the enhanced sentence here because the Guidelines do not apprise individuals in his position that the substance of a confession might be considered as relevant conduct. The rule of lenity was intended to ensure "that criminal statutes will provide fair warning concerning the conduct rendered illegal and [that rule] strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985); *see also United States v. Kozminski,* 487 U.S. 931, 952, 108 S.Ct. 2751, 2765, 101 L.Ed.2d 788 (1988). In *United States v. White,* 888 F.2d 490, 497–98 (7th Cir.1989), however, we rejected the argument that the rule of lenity would prohibit the consideration of uncharged relevant conduct for sentencing purposes:

The rule of lenity is a tie-breaker when there is an otherwise-unresolved ambiguity. It therefore does not come into play here. We

doubt that it has much role to play in interpreting the Guidelines.

The Guidelines clearly contemplate consideration of uncharged conduct such as that confessed to by Montgomery here. There is thus no need to resort to the rule of lenity because the intent of Congress as expressed in the Guidelines is clear. *See Liparota,* 471 U.S. at 427, 105 S.Ct. at 2089 (rule should not be applied where it would conflict with the implied or expressed intent of Congress; rather, it provides an interpretive guideline where congressional intent is unclear).

**9.** At the time of Montgomery's offenses, section 2D1.1(b)(1) provided for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed during commission of the offense." (1990 ed.). However, by the time of Montgomery's sentencing, that section had been amended to require only that the weapon be "possessed," not that it be possessed "during commission of the offense." *See* U.S.S.G. § 2D1.1(b)(1) (1991 ed.). The district court ap-

the weapon during the April 24 sale because he did not obtain it until the following day. Moreover, Montgomery maintains that the government produced no evidence that he possessed the weapon during the October 3 sale. In applying the enhancement, the district court found that although Montgomery did not obtain the gun until April 25, he possessed it during the deputies' execution of the search warrant and generally during the time that he was dealing cocaine. We review the lower court's application of the section 2D1.1(b)(1) enhancement for clear error. *United States v. Johnson,* 997 F.2d 248, 256 (7th Cir.1993); *United States v. Ewing,* 979 F.2d 1234, 1238 (7th Cir.1992).

▅ Our cases hold that under section 2D1.1(b)(1), "there is no need for proof of a nexus between the weapon and the crime; it is enough that it was possessed at the time of the offense." *United States v. Banks,* 987 F.2d 463, 467 (7th Cir.1993); *see also United States v. Durrive,* 902 F.2d 1221, 1232 (7th Cir.1990). We have interpreted the requirement that the weapon be possessed "during commission of the offense" to mean during "the crime *of conviction.*" *United States v. Rodriguez–Nuez,* 919 F.2d 461, 467 (7th Cir. 1990) (emphasis in original); *see also United States v. Baldwin,* 5 F.3d 241, 242 (7th Cir. 1993); *United States v. Edwards,* 940 F.2d 1061, 1064 (7th Cir.1991).[10] Here, Montgomery was convicted only of selling crack cocaine on April 24 and October 3, 1991. He was not convicted of an ongoing conspiracy to distribute crack cocaine. *Cf., e.g., Barker v. United States,* 7 F.3d 629 (7th Cir.1993), *cert. denied* — U.S. —, 114 S.Ct. 939, 127 L.Ed.2d 229 (1994); *Johnson,* 997 F.2d at 256–58; *United States v. Cantero,* 995 F.2d 1407, 1411 (7th Cir.1993); *United States v. Atterson,* 926 F.2d 649, 662–63 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2909,

115 L.Ed.2d 1072 (1991); *Durrive,* 902 F.2d at 1230–32.

There is no dispute that Montgomery did not possess the gun during the April 24 sale. Although he had purchased the firearm on April 19, he did not pick it up from the gun shop until April 25. The gun was seized from him the following day when deputies executed the search warrant, but no conviction resulted because the officers found no cocaine on the premises. Similarly, although the gun was subsequently returned to Montgomery, nothing indicates that he possessed the weapon during the October 3 sale. The record is devoid of any indication as to the whereabouts of the gun after it was returned to Montgomery; the weapon was not seized in connection with Montgomery's subsequent arrest. The government speculates that Montgomery's family probably retains the gun to this day, but there is no evidence that would support this assertion. We cannot assume possession of the firearm during the October 3 sale simply because we know Montgomery possessed a gun over five months earlier.[11]

The district court, however, emphasized that Montgomery possessed the gun generally during the time that he was dealing cocaine. Although the evidence adduced at the sentencing hearing would suggest that Montgomery made additional cocaine sales throughout the summer of 1991, he was not convicted of any such sales, nor were they considered as relevant conduct by the district judge. *See* n. 7, *supra.* In any event, there also is no evidence indicating possession of the firearm during these sales. Moreover, most if not all of the "relevant conduct" sales to which Montgomery confessed on April 26 occurred prior to his receipt of the firearm on April 25. Yet the enhancement would not apply to these sales in any event because "the rules of relevant conduct do not apply to the dangerous weapon enhancement found in § 2D1.1." *Baldwin,* 5 F.3d at 242. We

---

plied the 1990 version (*see* May 8, 1992 Tr. at 11–12), and the government has raised no objection to that here. We thus will not disturb the district court's decision to apply the version that was in effect at the time of Montgomery's offenses. *See Harris,* 994 F.2d at 416 n. 9.

**10.** Under the amended version of section 2D1.1(b)(1), however, "the government need no longer prove that the defendant possessed [the

weapon] during the offense of conviction." *Baldwin,* 5 F.3d at 243 n. 3.

**11.** Absent evidence that the weapon was possessed during either offense of conviction, we need not consider whether "it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 Application Note 3.

therefore find that the district court clearly erred in applying the two-level enhancement, and we accordingly vacate Montgomery's sentence and remand for resentencing.

## III. CONCLUSION

Because Montgomery's April 26, 1991 statement was properly admitted into evidence at his trial, we AFFIRM his convictions. The district court also properly included the sales referenced in the statement as relevant conduct in calculating Montgomery's base offense level. Yet, because the district court erred in applying a two-level enhancement for possession of a firearm during commission of a drug offense, we VACATE Montgomery's sentence and REMAND for resentencing.