**UNITED STATES of America, Plaintiff,**

v.

**D.F., Defendant.**

**No. 93–CR–202 (JPS).**

United States District Court,
E.D. Wisconsin.

July 19, 1994.

Stephen A. Ingraham, Asst. U.S. Atty., Milwaukee, WI, for plaintiff.

Dean A. Strang, Shellow, Shellow & Glynn, S.C., Milwaukee, WI, for defendant.

## DECISION AND ORDER (REDACTED)

STADTMUELLER, District Judge.

This tragic case began on January 5, 1992, when an infant girl was found dead in her parents' home [redacted]. Six days later, her sister was also found dead. Their deaths were initially attributed to Sudden Infant Death Syndrome and influenza. Based on a series of statements made to mental health counselors and reported to law enforcement officials, however, the Government subsequently charged the infants' cousin, D.F., with murder. Today, the court decides whether the Government may use D.F.'s statements to support its case against her.[1]

### Procedural History

On November 17, 1993, the Government filed an information charging D.F., a juvenile, with two counts of murder in the second degree, in violation of 18 U.S.C. § 1111, 1153, and 5031. D.F. made an initial appearance in U.S. Magistrate Judge Aaron E. Goodstein's court on November 18, 1993. On March 7, 1994, D.F. moved to suppress a series of inculpatory statements she made to [redacted] County Mental Health Center ("Center") therapists and staff members. In that motion, D.F. argued that the statements were procured in violation of the Fifth Amendment's privilege against self-incrimination and the Fifth Amendment's guarantee of due process. D.F. reserved an argument that the statements were protected by the psychotherapist-patient privilege for trial.

In recommending that the statements be suppressed, Magistrate Goodstein found that although the protections against self-incrimination announced in *Miranda v. Arizona* did not apply to limit D.F.'s discussions with the Center staff, her statements made during the course of therapy were absolutely protected from disclosure by the psychotherapist-patient privilege. Both parties objected to the Magistrate's Recommendation: the Government objected to the overall recommendation, and to the Magistrate's findings on the psychotherapist-patient privilege; D.F. objected to the Magistrate's findings on the *Miranda* issue, and renewed her argument that the statements were not voluntarily made.

### Facts[2]

■ At all times relevant to the suppression motion, D.F. was thirteen or fourteen years old. She presents a history of runaway behavior, assaultive behavior, and drug and alcohol abuse. (Transcript of Proceedings Exhibit ("Ex.") J–1.) There is evidence that she suffered from extensive abuse, including physical and sexual abuse, during her childhood. (Ex. J–1 at 2.) She has had extensive exposure to the juvenile social services and justice system. (Ex. J–1 at 1.)

---

1. D.F.'s motion for a jury trial is also pending before the court. The Government's papers suggest, however, that, given the court's ruling on the defendant's motion to suppress, that motion has become moot. As a result, the court will defer a ruling on the defendant's motion for a jury trial until and unless it becomes necessary.

2. The court did not hold an evidentiary hearing on this motion. As a result, the factual findings come from the parties' agreed statements of facts, the magistrate's findings, and the transcript of the magistrate's hearing on this issue. To the extent that the magistrate's findings are dependent upon credibility determinations, this court may not reject them unless they are clearly erroneous. *United States v. Ornelas–Ledesma*, 16 F.3d 714, 720 (7th Cir.1994). In all other respects, the court's review is *de novo*.

Prior to being charged in this case, she had been charged with battery on at least three occasions, and was suspected in at least three other incidents. (Ex. 1 at 8, J-1 at 1-2.) She has lived with five different legal guardians, and has considered a sixth. (Ex. 1 at 9, J-1 at 1.)

From December 4, 1992 to May 14, 1993, D.F. participated in a residential treatment program at the Center. For our purposes, D.F.'s placement at the Center was less than voluntary.[3] There is no evidence in the record that D.F. played any role in the admission decision.[4] Moreover, the evidence suggests that Ms. A., D.F.'s aunt and the person who technically made the admission decision, was heavily influenced in making that decision both by a pending court order and by the Department of Social Services' suggestion that D.F. be placed at the Center. (Transcript of Proceedings ("T.") at 247–48; Third Supplemental Statement of Uncontested Facts ("Third Facts") at 6.) In light of D.F.'s alcohol and drug problems, the Department had the power to remove her from Ms. A.'s home or to move in court for an involuntary placement. (Magistrate's Recommendation ("R.") at 2; T. at 247–49; Third Facts at 6–7.)

Each patient[5] at the Center interacted with and was treated by a number of different staff members. As a general matter, however, a team of professionals (including a psychiatrist, a social worker, a registered nurse, an occupational therapist, and a recreational therapist) was responsible for the progress and treatment of each patient. (T. at 128; Third Facts at 2.)

Children and adolescents at the Center were considered to be the patients of Dr. J.G., staff psychiatrist and Director of the Child and Adolescent Unit at the Center. (Third Facts at 3.) In his clinical role, Dr. G. performed a number of functions: he attended weekly team meetings, he supervised the social workers and registered nurses on the team, and he made high level clinical decisions, including decisions about medications and level of supervision. (Third Facts at 4.) He also had direct contact with each patient at least once a week. (Third Facts at 4.)

Day-to-day treatment responsibilities, however, were left to the remaining members of the team. Social workers, with occasional supervision from Dr. G., made the necessary treatment decisions. (Third Facts at 2, 4–5.) Initially, R.M. served as the social worker for D.F; B.K. assumed those duties at a later time. Registered nurses met directly with Dr. G. to review patients' charts on weekdays. (Third Facts at 2, 4.)

As a general rule, statements made by patients at the Center were considered "confidential," and were not to be reported to anyone other than the other members of the treatment team. (T. at 119, 194–95.) There were a host of exceptions to this rule of "confidentiality," however. Patient statements were shared with a liaison official from the [redacted] County Department of Social Services, who was part of the treatment team. In addition, general statements (statements not relating to child abuse) could also be passed on, at the social worker's discretion, to personnel from the [redacted] County Department of Social Services (including the Children's Protective Services Unit, or "Protective Services"), the [redacted] County Juvenile Court, and the [redacted] Public Schools. (T. at 128–31.)

Other exceptions were created by statute. The Wisconsin Children's Code created mandatory reporting requirements for accounts of child abuse *by victims.* Wis.Stat.Ann. § 48.981. Under the reporting provisions, members of the treatment teams (physicians, nurses, social workers, occupational thera-

---

3. From a nonconstitutional legal standpoint, however, she participated in the program as a voluntary admission (as opposed to a court-ordered involuntary admission).

4. In D.F.'s Initial Psychiatric Evaluation, Dr. E.J., the Associate Clinical Director of the Center, notes her attitude toward her admission:
 The patient's thought content seems to be somewhat preoccupied with her ambivalence about being in the hospital. She is particularly uncomfortable with her admission status and the lack of freedom involved with that.
 (Ex. J-1.)

5. Residents at the Center are alternatively referred to as "patients" and "clients." For ease of reference, I will refer to them as "patients."

pists) were required to report any suspicions that a patient had been abused. *Id.* The provisions also provided that "other persons" suspecting abuse of *any child* (i.e., including abuse by a patient of another child) *may* report those suspicions. *Id.* The provisions do not appear to address the situation at issue in this case, i.e., a team member suspecting that a patient had abused another child. To the extent that they do address that situation, they appear to preclude disclosure of such suspicions: "[t]he purpose of this subsection is to allow children to obtain confidential health care services." *Id.*

Mr. M. and Ms. K. and, apparently, several other staff members misunderstood the reporting provisions during most of D.F.'s stay at the Center. Upon admission to the Center, D.F. was shown and signed a form that outlined the limits on confidentiality at the Center. (Ex. B–1; T. at 280.) Mr. M. presented the form to her, and suggested to her that any statements she made about abuse of other children would have to be reported. (T. at 280.)

Patients at the Center were told that their statements were confidential, at least with respect to the unit. (T. at 209.) There is evidence that D.F. thought that statements made during therapy and to staff were confidential. (Ex. F–1 at 1.) However, there is also evidence that she knew her statements would be reported. In January 1993, D.F. refused to answer an explicit query about whether she had ever murdered anyone. (Ex. B–3; T. at 288.) She also refused to talk during another encounter, stating that she couldn't because of staff's reporting requirements. (Ex. C–5; T. at 403.) Ms. A. also informed Mr. M. of a statement by D.F.: "if all is known about what she's done, she'd go to jail for a long time." (Ex. B–4.) To the extent that D.F. knew about mandatory reporting, however, it is not at all clear that she knew the destination and consequences of any reporting.

While at the Center, D.F. did enjoy some level of freedom. Although she lived in Unit One, a locked unit, she was able to move around within the unit and to other buildings

for school and meals. (R. at 3; T. at 25–28.) Supervision while on campus varied depending on behavioral and safety concerns. (R. at 3; T. at 26.) Patients could negotiate temporary *supervised* trips off campus after they had earned sufficient behavior "points" (see discussion, *infra*). (T. at 28–31.) Patients under fourteen could only leave the Center permanently with family help. (T. at 28.) Those who were fourteen years old or older could leave the Center without family help, but only after waiting a period of forty-eight hours. (R. at 3; T. at 250–51.) During that forty-eight hour period, the medical director could go to court to prevent the patient from leaving. (R. at 3; T. at 251.) D.F. invoked her right to leave the Center on April 8, 1993; she later rescinded. (Ex. B–8; T. at 308–311.)

Staff at the Center "encouraged" the patients to discuss their problems openly and honestly. This "encouragement" took many forms. As a general matter, patient privileges and relative freedoms were determined through the use of a point system. (T. at 261.) Points could be earned for, among other things, open and sincere participation in group therapy sessions, as well as open and honest discussion in one's journal; failure to do these things could result in a loss of points. (T. at 165, 262.) Patients also had to have regular conversations with their "person in charge" (usually nursing staff) about "why they are there." [6] (T. at 157–58, 203, 223.) Over and above the point system, patients were constantly encouraged to open up and be honest with staff and with family about their problems; frank exchanges were considered critical both to general treatment goals and to establishing a level of trust between staff and the patients. (*E.g.,* T. at 318–19.)

Because of her behavioral problems and her problems with mistrust of authority, D.F., in particular, had a care plan specially designed to encourage her to address anger issues by speaking frankly about the abuse she had inflicted on other children. (Ex. 5–8; T. at 266, 419.) For example, on December 31, 1992, she was encouraged to discuss her

---

**6.** In addition, when patients were on suicide watch (as D.F. often was), they were further

encouraged to open up and discuss their problems. (T. at 403–404, 407.)

abuse of smaller children in her care; at the end of the session, she was "encouraged to work on these issues and to write more in her journal relating to these issues." (Ex. 6 at 2; T. at 267–68.) On January 1, 1993, she was given an assignment "to make a list of people she has hurt." (Ex. C–3, 7; T. at 225–26, 267–70, 415.) On January 18, 1993, she was asked whether she had ever murdered anyone. (Ex. B–3; T. at 117, 287–88.) T.K., a member of D.F.'s treatment team, stated in an interim note on D.F.'s progress that exploration of D.F.'s physical abuse of young children was "of utmost importance." (Ex. 10 at 1; T. at 354–56.)

Occasionally, through negotiations with the juvenile justice system, staff at the Center were able to exert extra leverage on their patients. On March 2, Mr. M. informed D.F. that she would not be prosecuted for her admitted assaults provided that she continued to make treatment progress, and follow treatment expectations. (Ex. B–5; T. at 327.) "Making treatment progress" included avoiding going AWOL, and "continuing to participate sincerely" in treatment. (T. at 329.) By negotiating this arrangement with Protective Services, and by communicating it to D.F., Mr. M. sent two very clear messages: (1) D.F.'s frank disclosure of her past behavior would be generously rewarded, and (2) she would likely be granted leniency on any future disclosures.

Once a particular problem in D.F.'s past became apparent, she was pushed even harder to discuss it. For example, after April 5, when D.F. made her initial disclosures, further discussion about her role in her cousins' deaths was encouraged; in fact, it became part of her care plan. (Ex. F–1 at 1.) For example, on two occasions, staff told her (1) to "tell the truth ... tell them how you did it"; and (2) "these are the reasons you're here, you need to talk about them and get them resolved." (Ex. F–1, I–1; T. at 183–85, 206–07.)

While D.F. was at the Center, Mr. M. cooperated with staff at Protective Services

in [redacted] County and [redacted] County. He provided information to Protective Services about statements D.F. made while at the Center. (T. at 290–93.) He arranged for D.F.'s records, which included admissions regarding crimes, to be released to Protective Services. (T. at 292–93.) He also arranged for Protective Services to question D.F.: [redacted] County staff questioned her twice in January, (T. at 290–91); a worker from [redacted] County spoke with D.F. on February 11. (T. at 290, 325–26.)

For many staffers, this broad policy of "encouragement" appears to have been motivated solely by treatment concerns. Encouraging D.F. to talk about her past actions was part of her care plan, and was universally seen as therapeutic and essential to any recovery. Some staff, however, took a more expansive view of "therapy" and "recovery." Staffers subscribing to this expanded view felt that D.F. would not recover unless and until she took responsibility for her wrongs and was held accountable for them, in a court of law if necessary. (T. at 162, 178, 192, 342–43.)

Mr. M. was informed in December 1992 that D.F. was suspected in the deaths of her two cousins and in the assaults of other cousins.[7] (R. at 4; Ex. B–2 at 2; T. at 283.) Ms. K. learned about these suspicions sometime before February 23, 1993. (Ex. A–1.) At that time, both counselors felt that the Wisconsin child abuse reporting requirements required them to report any incriminating admissions made by D.F. to law enforcement authorities. (R. at 4; T. at 41.) Consequently, Mr. M. warned D.F. that she should be cautious about what she said, and that her counselors would have to report any disclosures she made about harming other children. (R. at 4.) He estimates that he warned her in this way on approximately ten occasions and recorded notes about his warnings in her chart about four times. (R. at 4.) Exhibits before the court reflect two such warnings. (Ex. B–4, A–1.) [8]

---

**7.** Obviously, the fact that Ms. N.M., the [redacted] County employee who advised Ms. A. to admit D.F. to the Center, was also feeding Mr. M. information about D.F.'s crimes doesn't help the Government's argument that there was no law enforcement involvement here.

**8.** Mr. M. started to question his initial reading of the reporting requirements sometime in the end

These warnings apparently had a mixed effect on D.F.. On one hand, several factors were working to limit the effect of the warnings. At the same time that Mr. M. was warning her about her disclosures, the staff plan was to get her to open up, to disclose as much as possible. (T. at 322–24.) Moreover, in his "warnings" to D.F., Mr. M. never warned D.F. that her statements might be used in court, or that she could have a lawyer present. (T. at 321; *cf.* T. at 209.) Additionally, the warnings were based on an admittedly mistaken reading of the Wisconsin child abuse reporting requirements. (T. at 321.) On the other hand, the warnings did seem to have some effect. As the discussion above, *supra* pp. 1314–1315, demonstrates, D.F. resisted the considerable pressure to confess for several months.

On April 5, 1993, she broke down and confessed. At a group meeting with Ms. K., eight to ten other adolescents, and an "adult co-facilitator," D.F. admitted to killing her two cousins. (R. at 5; T. at 45–49.) [9] Ms. K. memorialized D.F.'s confession that same night, and informed Ms. A. about it. (T. at 51, 60.) She did not, however, consult with or inform Ms. A. or D.F. about her decision to report it. (T. at 125–26.)

The next day, at the weekly team meeting, Ms. K. informed the members of the team of D.F.'s confession. (R. at 6.) D.V., a liaison from the Department of Social Services, immediately went to the telephone and reported D.F.'s disclosures to Protective Services. [10] (R. at 53.) As a result of this report, the F.B.I. initiated the investigation that led to D.F.'s arrest. (R. at 6.)

Later that day, Ms. K., Mr. M., and Dr. G. had further discussions regarding whether D.F.'s statements should have been disclosed. (R. at 7; Ex. A–3; T. at 53–55.) Mr. M. expressed concerns regarding whether the disclosures should have been made; Dr. G., a psychiatrist at the Center for 25 years, was not sure whether the disclosure should or could have been made, and suggested that Mr. M. and Ms. K. seek further professional advice about what to do next. (T. at 54.)

On April 16, in responding to a call from the F.B.I. about D.F.'s admissions, Ms. K. expressed her uncertainty regarding the propriety of the disclosure. (T. at 62.) Later that day, she was informed for the first time by administrators and counsel at the Center that she had been permitted, but not required, by the Wisconsin Child Abuse reporting provisions to report D.F.'s statements. (R. at 7; T. at 64, 145–50.) *See* Wis.Stat. Ann. § 48.981.[11] She was also informed that because she had warned D.F. of her reporting requirements and reported in good faith, her permissive reporting was appropriate. (Ex. A–6; T. at 147.) They further advised her to cooperate with the F.B.I., and she decided to do so. (T. at 151.)

Sometime in April,[12] Ms. K., D.F., and several nursing assistants met with Mr. F.,

---

of March. (T. at 299–300.) At a weekly meeting, team members discussed whether not reporting D.F. admissions might be an option. (T. at 301.)

**9.** In addition to the admissions mentioned below, D.F. also repeated her admissions to staff on a number of occasions, including April 14. (T. at 160–63.) She was not warned about the consequences of disclosure before any of her subsequent disclosures. (T. at 317.)

**10.** In light of the Department of Social Services presence on the treatment team, and the Center's close working relationship with Protective Services and the juvenile court system, it is difficult to tell exactly when D.F.'s statements technically were "reported" for the purposes of the Wisconsin Reporting Statutes or who reported them. Such determinations are not necessary, however, for resolution of this motion. The important fact is that D.F.'s statements were reported, directly or indirectly, to law enforcement.

The court notes, however, that in her testimony, Ms. K. essentially assumes that she was the one who reported the statements. She also admits that, when the information was reported, she knew that it would likely lead to charges being filed against D.F. (T. at 144–45.)

**11.** In fact, advice from counsel may have been wrong. From the court's reading, § 48.981 does not permit or require Ms. K. to disclose D.F.'s statements. In fact, it doesn't address D.F.'s situation at all. Moreover, the court notes that if these disclosures had been made several months earlier, during D.F.'s time in the Center's drug and alcohol program (or if they had been made by Mr. M.), they might have violated federal law. *See* Ex. B–1; 42 U.S.C. § 290ee–3.

**12.** Ms. K. states that the meeting took place on April 22; however, Mr. F.'s affidavit regarding the meeting is dated April 21. It appears, however, that the meeting did occur after Ms. K.'s

an attorney from [redacted] who had been appointed to provide D.F. with precharge representation. (T. at 66–67; F. Aff. at 2–3.) At that meeting, Mr. F. told D.F. not to speak to any law enforcement agents or County Social Services personnel. (R. at 7; T. at 66–67.) He warned her that family and friends with information could be forced to disclose it. (Ex. A–5; T. at 66–67.) At that time, D.F. signed an invocation of her Fifth Amendment rights in Ms. K.'s presence.[13] (R. at 7; Ex. 12.)

Ms. K. did not inform Mr. F. at this meeting of her current and future plans to cooperate with the F.B.I. (T. at 359; F. Aff. at 2.) It does not appear that D.F. had been informed of Ms. K.'s cooperation. (T. at 356–58, 338–39.) If Mr. F. had known of such cooperation, he would have taken steps to ensure that D.F. did not talk to any Center staff and, ultimately, to ensure that D.F. was removed from the Center. (F. Aff. at 2–3.) Ms. K. told Mr. F. that therapy sessions were "confidential," and did not tell him of the Center's aforementioned position regarding the permissive reporting of statements made in these supposedly "confidential" therapy sessions. (T. at 360.)

D.F. repeated her confession at family therapy meetings on April 14, April 23 and May 10.[14] (R. at 7; Ex. A–6, A–7, A–8, B–7 at 2; T. at 70–83.) Incredibly, despite Ms. K.'s discussions with the F.B.I. and corporation counsel, and Mr. V.'s discussions with Protective Services, Ms. K. reassured the

family and D.F. of the confidentiality of the family therapy sessions at the April 23 session. (R. at 7; Ex. A–6; T. at 55–56.) During the April 23 and May 10 sessions, she asked "facilitating" questions that were designed to encourage a free discussion of D.F.'s actions. (T. at 362–63, 367–68.) Partially out of a concern that she might be asked by law enforcement exactly what D.F. had said, Ms. K. included in her notes of the May 10 meeting direct quotes from D.F. (T. at 368–69.)

After her initial disclosures on April 5, D.F. was constantly "encouraged" to repeat and expand upon those disclosures. (T. at 231–32.) In response to this "encouragement," she made incriminating statements on a number of other occasions. (Ex. E–3, E–4; T. at 231–32, 382–86.) The Government seeks to use all of these statements in its murder case against D.F.

### Discussion

 Magistrate Goodstein recommended that the statements made by D.F. during the course of her psychotherapy be suppressed. This court's review of that recommendation is *de novo.* 28 U.S.C. § 636(b)(1)(C).[15] The Magistrate based his recommendation on the psychotherapist-patient privilege, the starting point of my analysis.

### I

 The application of nonconstitutional privileges in the federal courts is governed by the Rules of Evidence:

---

meeting with administrators and counsel for the Center on April 16.

**13.** The invocation reads as follows:

I, ... [D.F.], hereby declare that I do not want to be questioned by the police, sheriff's department, district attorney, or any other law enforcement official concerning the pending charge or any other matter without my attorney being present. Therefore, I am invoking my right to remain silent and right to counsel protected under the Fifth Amendment of the United States Constitution.

Ex. 12.

**14.** Ms. K. also recalls an April 9 meeting in which D.F. recounted her role in her cousins' deaths. Presumably because there were no notes taken of that meeting, however, the Magistrate did not credit Ms. K.'s testimony in his findings of fact. A review of the transcript suggests that that was the correct decision.

**15.** As an initial matter, the Government objected to the Magistrate's findings on the psychotherapist-patient privilege issue because (1) that issue had not been raised by the parties and (2) matters of nonconstitutional privilege are not properly handled in the context of a motion to suppress. As a technical matter, these procedural arguments may have some merit. At this point, however, any procedural error is harmless, as the factual record and legal briefing now before the court is sufficient to decide the privilege issue. Certainly, neither the interests of justice nor the interests of judicial economy would be served if the court chose to deny the motion to suppress on procedural grounds and then later adopt the Magistrate's reasoning in response to a motion to exclude the statements on evidentiary grounds.

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501. Without the benefit of briefing from the parties, the Magistrate, in applying Rule 501 to the facts of this case, found that state law of nonconstitutional privilege should govern. (R. at 11.) The parties argue, and the court agrees, that this finding was in error,[16] and that the court must look instead to federal law to determine the existence and scope of any psychotherapist-patient privilege.[17]

Congress has mandated that "principles of common law ... in light of reason and experience" govern the application of nonconstitutional privileges. *See* Fed.R.Evid. 501. The court recognizes that the psychotherapist-patient privilege did not exist at common law.[18] Note, *Developments in the Law— Privileged Communications*, 98 Harv.L.Rev.

1450, 1539 (1985). Several circuit courts have held that that recognition precludes further analysis under Rule 501. *See In re Grand Jury Proceedings*, 867 F.2d 562, 565 (9th Cir.) ("[b]ecause our discretion under Rule 501 is limited to the development of privileges extant in the common law, we affirm the district court's denial of the motion to quash subpoenas of Doe's psychiatric records.... we decline to reach the merits of the efficacy of the psychotherapist-patient privilege by this holding, but we do opine that if such a privilege is to be recognized in federal criminal proceedings, it is up to Congress to define it, not this court"), *cert. denied*, 493 U.S. 906, 110 S.Ct. 265, 107 L.Ed.2d 214 (1989); *United States v. Corona*, 849 F.2d 562, 567 (11th Cir.1988) ("evidentiary privileges in federal criminal cases are governed by common law ... neither common law nor statutory law provides for any type of physician-patient privilege"), *cert. denied*, 489 U.S. 1084, 109 S.Ct. 1542, 103 L.Ed.2d 846 (1989).

This approach appears too rigid. Although Congress in Rule 501 makes reference to the common law, that does not mean that it intended to arbitrarily freeze privilege law in its 1974 state. To the contrary, the Supreme Court has found, and the legislative history suggests, that Congress enacted Rule 501 to allow the courts maximum flexibility in addressing privilege questions on a case-by-case basis. *See United States v. Gillock*, 445 U.S. 360, 367, 100 S.Ct. 1185, 1190–91, 63

---

16. "In nondiversity jurisdiction civil cases, federal privilege law will generally apply.... As Justice Jackson has said:

 A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state.

 *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 471, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (Jackson, J., concurring)." Conference Report No. 93–1597, 93d Congress, 2d Session 4 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7098, 7101.

 Note also that the court is not convinced that D.F.'s statements would be protected under the Wisconsin psychotherapist-patient privilege. *See* Wis.Stat.Ann. § 905.04. Under Wisconsin law,

"[t]here is no privilege in trials for homicide when the disclosure relates directly to the facts or immediate circumstances of the homicide." Wis.Stat.Ann. § 905.04(4)(d). What little case law there is on the homicide trial exception suggests that it would apply to the facts of this case. *See, e.g., State v. Jenkins*, 80 Wis.2d 426, 259 N.W.2d 109, 113 (1977).

17. Federal juvenile proceedings such as this one are technically classified as "civil" in nature. Nevertheless, because substantive federal law will govern in this action, Rule 501 clearly provides that federal common law govern with respect to nonconstitutional privileges.

18. Where the privilege exists, it was created by statute. *See In re Grand Jury Proceedings*, 867 F.2d 562, 565 (9th Cir.1989), *cert. denied*, 493 U.S. 906, 110 S.Ct. 265, 107 L.Ed.2d 214 (1989).

L.Ed.2d 454 (1980)[19]; Statement by the Honorable William L. Hungate, Chairman of the House Judiciary Subcommittee on Criminal Justice, Upon Presenting the Conference Report on H.R. 5463 to the House for Final Consideration 3 (December 18, 1974) ("Rule 501 is not intended to freeze the law of privilege as it now exists ... [it] is intended to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis"), *reprinted in* 1974 U.S.C.C.A.N. 7108, 7110. In fact, the legislative history suggests that, when it decided not to include a specifically enumerated psychotherapist-patient privilege, Congress recognized and approved of the application of such a privilege under certain circumstances:

> ... It should be clearly understood that, in approving this general rule as to privileges, the action of Congress should not be understood as disapproving any recognition of a psychiatrist-patient, or husband-wife, or any other of the enumerated privileges contained in the Supreme Court rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis.

S.Rep. No. 93–1277, 93d Congress, 2d Session 9 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7059.

■ In the abstract, "in light of reason and experience," I am convinced that "a psychotherapist-patient privilege of some form furthers sufficiently important and overriding interests so that recognition of the privilege is appropriate under Rule 501." *In re Grand Jury Subpoena*, 710 F.Supp. 999 (D.N.J.1989), *aff'd*, 879 F.2d 861 (3d Cir. June 27, 1989). Recognition of such a privilege would serve at least two important interests: effective psychiatric treatment[20] and privacy.[21] At the same time, it would

---

**19.** The Court in *Gillock* also suggested that inclusion of a particular privilege in the Judicial Conference's proposed draft of enumerated privileges weighed in favor of recognizing the privilege under Rule 501.

**20.** The most common articulation of the effective treatment, or utilitarian, justification for the privilege was quoted by the Sixth Circuit in the primary case recognizing the privilege:

> Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of exceptions to this general rule ... there is wide agreement that confidentiality is a sine qua non for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.
>
> Report No. 45, Group for the Advancement of Psychiatry 92 (1960), *quoted in* Advisory Committee's Notes to Proposed Rules, 56 F.R.D. at 242.

*In re Zuniga*, 714 F.2d 632, 638 (6th Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983); *see also In re Grand Jury Subpoena*, 710 F.Supp. 999, 1006–07 (D.N.J.1989), *aff'd*, 879 F.2d 861 (3d Cir. June 27, 1989).

Some Commentators have questioned the empirical basis for this justification, which "derives from an essentially Freudian model of psychoanalysis." Note, *Developments in the Law—Privileged Communications*, 98 Harv.L.Rev. 1450, 1542–44 (1985); *cf.* Shuman and Weiner, *The Privilege Study: An Empirical Examination of the Psychotherapist Privilege*, 60 N.C.L.Rev. 893, 919–20 (1982). Moreover, it is clear that Congress' decision to pass Rule 501 rather than the Advisory Committee's version (which included specifically enumerated privileges of specifically articulated scope), as well as its suggestion that the rules of privilege be adopted on a "case-by-case" basis, undermines any utilitarian justification for the privilege. Individuals undergoing therapy are not as likely to rely on the existence of a psychotherapist-patient privilege when its application and scope varies from case to case and from district to district.

Notwithstanding these reservations, I do believe that the utilitarian justification holds some intuitive appeal. The reservations are important to keep in mind, however, when applying the privilege in any individual case.

**21.** The cases reference two aspects of the constitutional protection of privacy:

> One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

*Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977), *cited with approval in In re Grand Jury Subpoena*, 710 F.Supp. 999, 1008 (D.N.J.), *aff'd*, 879 F.2d 861 (3d Cir. June 27, 1989). Both aspects are implicated

impair the truth-seeking process by shielding potentially relevant evidence from the factfinder, and ultimately limit the effectiveness of federal prosecutions. I am persuaded by the courts and commentators that have argued that in some cases, the former interests outweigh the latter. *See, e.g., In re Doe*, 964 F.2d 1325, 1328 (2d Cir.1992); *In re Zuniga*, 714 F.2d 632, 639 (6th Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983); *Grand Jury Subpoena*, 710 F.Supp. at 1012; *Cunningham v. Southlake Center for Mental Health, Inc.*, 125 F.R.D. 474, 477 (N.D.Ind.1989) ("[i]t seems clear that the Seventh Circuit would recognize a psychotherapist-patient in the present case because the information sought regarding Cooper's sessions with Dopson and her alleged revelations to Dopson involve 'substantial accounts of therapy sessions'") (citing *In re Pebsworth*, 705 F.2d 261, 263 (7th Cir.1983)); Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* 504–21—504–23 (1993); Note, *Developments in the Law—Privileged Communications*, 98 Harv.L.Rev. 1450, 1548–55 (1985). Thus, the court will recognize the psychotherapist-patient privilege.

■ The decision to recognize the psychotherapist-patient privilege does not end the court's inquiry, however. Privileges judicially created or recognized under Rule 501 are not absolute. This is especially true with respect to the psychotherapist-patient privilege, which has been treated (by those courts that have recognized it) as "highly qualified." *See In re Doe*, 964 F.2d at 1328 ("[i]ndeed, the privilege amounts only to a requirement that a court give consideration to a witness's privacy interests as an important factor to be weighed in the balance in considering the admissibility of psychiatric histories or diagnoses"). Cf. *Zuniga*, 714 F.2d at 640; *Grand Jury Subpoena*, 710 F.Supp. at 1013–14; *Cunningham*, 125 F.R.D. at 476–77 (all recognizing the privilege in the abstract, but declining to apply it to preclude discovery or admissibility). Consistent with the case-by-case approach mandated by Rule 501, the court must now consider whether, in the instant case, the privilege should apply to D.F.'s statements.

Courts applying the privilege have limited its scope in at least two ways. Some courts have applied an interest-balancing analysis, while others have displayed a definitional analysis.[22] Under both approaches, the focus, as I have described above, has been on limiting, or "qualifying," the scope of the privilege. These limits present serious difficulties for D.F.'s invocation of the privilege.

■ Under an interest-balancing approach, the court must consider the extent to which the justifications for the privilege—the

---

when statements made to a psychotherapist are disclosed. *See Grand Jury Subpoena*, 710 F.Supp. at 1008–09.

**22.** Under what I have called a "definitional" analysis, the court adopts and applies to the individual factual situation a certain definition of privileged communications and a set of exceptions to the privilege. *See Cunningham v. Southlake Center for Mental Health, Inc.*, 125 F.R.D. 474, 477 (N.D.Ind.1989); *cf. In re Grand Jury Subpoena*, 710 F.Supp. 999, 1013 (D.N.J.1989) ("[i]ndeed, this case suggests the need to expand the range of exceptions to the privilege beyond those contained in Proposed Rule 504"), *aff'd*, 879 F.2d 861 (3d Cir. June 27, 1989). For most courts, such an analysis will differ little from an interest-balancing analysis, as the contours of the definition of privileged communications and the scope of the exceptions will be based on a balancing of the interests at stake. *See, e.g., Grand Jury Subpoena*, 710 F.Supp. at 1013–15 (creating an exception to the Advisory Committee's Proposed Rule 504 based on the weight of the interests at stake).

In my discussion below, I apply an interest-balancing analysis, and arrive at the conclusion that the privilege should not be applied in this case. It is worth noting, however, that the result would be no different under a definitional approach. D.F. would have difficulty showing that her statements (1) were confidential; (2) were made to medical personnel covered by the privilege; and (3) would not be excepted from the privilege (a) based on a criminal trial exception, (b) based on a homicide trial exception, (c) based on a child abuse exception, or (d) based on an exception for individuals posing dangers to others. *See generally* Proposed Rule 504, *reprinted in* Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* 504–1, 504–1–2 (1993); *Cunningham v. Southlake Center for Mental Health, Inc.*, 125 F.R.D. 474, 477 (N.D.Ind.1989) (absent showing of close supervision, extension of privilege to communications with social worker is unwarranted); Brian Domb, *I Shot the Sheriff, but Only My Analyst Knows: Shrinking the Psychotherapist–Patient Privilege*, 5 J.L. & Health 209 (1990/91) (discussing the scope of the privilege and of the various exceptions).

interests in effective therapy and in privacy—are promoted under these facts, and whether those interests outweigh the Government's (and, indeed, the system's) need for the information. Several aspects of this case suggest that the utilitarian gains from the privilege would be minimal. First, the interest in effective therapy will only be served to the extent that D.F., a fourteen year-old girl, understood the implications of disclosure. Although she had had some experience in the justice system, it is not clear that D.F. realized the serious consequences a charge of murder would bring. Second, to the extent that she did understand the consequences of disclosure, there is evidence in the record to suggest that she believed that the staff at the Center was required to disclose her statements, i.e., that the privilege would not protect her statements. To the extent that that is the case, the privilege would have been irrelevant; it would not have served any utilitarian purpose. Third, to the extent that D.F.'s "therapy" at the Center was compelled or coerced (see discussion below), the existence of the privilege likely provided only marginal utilitarian gains.

Application of the privilege in this case would do very little to promote privacy interests. The facts of this case suggest that, regardless of whether this court finds that D.F.'s statements were privileged, her personal privacy has already been seriously compromised. The statements have already been widely disseminated amongst both governmental officials and other patients. Moreover, any residual privacy concerns the court might have are tempered by the private nature of this juvenile proceeding.[23]

Under the facts of this case, application of a psychotherapist-patient privilege would also do very little to promote personal autonomy. Because D.F. is a juvenile, her decisional independence in matters of physical and mental health is limited anyway; many of these decisions will be made by parents, relatives, or guardians. Moreover, D.F. didn't appear to have any chance to exercise what little decisional independence she did have; she was admitted to the Center as a direct result of her involvement with the criminal justice system.[24]

On the other hand, the interests weighing against the privilege in this case are considerable. The Government believes that the two infants involved were murdered. D.F.'s statements are clearly relevant to that charge. In fact, the Government has suggested that that charge cannot be sustained without that evidence.[25] Thus, nondisclosure would significantly impair both law enforcement interests and a general interest in the truth-seeking process.

In sum, disclosure of D.F.'s statements would not significantly impact utilitarian or privacy interests. On the other hand, nondisclosure would seriously impact Government law enforcement interests as well as the truth-seeking process that is an integral part of our justice system.

Ultimately, this case should not be decided on nonconstitutional grounds. Absent the constitutional dimension of this case, I would be extremely reluctant to suppress D.F.'s statements. If D.F. were a critical defense witness in a murder case, and the Government could not impeach her without her statements to her psychotherapist, I would not hesitate to order or allow disclosure. This case is only difficult because D.F.'s statements amounted to a confession of murder. A confession made under circumstances such as those present here inherently raises constitutional concerns. This case should be decided based on those concerns.

## II

In his recommendation, the Magistrate found no violation of the Fifth Amendment's

---

23. Although the Magistrate has granted media access to the proceedings, that access is subject to strict limitations.

24. As I discussed earlier, D.F. did have some control over her status as a patient at the Center. Moreover, she also had some control over the extent to which she would cooperate with staff and participate in treatment. Nevertheless, her overall decisional independence was very limited.

25. "This action [the Magistrate's suppression of D.F.'s statements], if upheld, would result in the termination of the government's case." Government's Objection to Magistrate's Recommendation at 2.

protections against self-incrimination. D.F. objected to this aspect of the recommendation.

The Fifth Amendment provides an absolute privilege against self-incrimination in a criminal trial: "nor shall any person ... be compelled in any criminal case to be a witness against himself". Although the question has never been clearly addressed by the Supreme Court, there seems to be little doubt that the privilege applies in juvenile proceedings. *See In re Gault,* 387 U.S. 1, 30–31, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967); *Fare v. Michael C.,* 442 U.S. 707, 717–18, 99 S.Ct. 2560, 2567–68, 61 L.Ed.2d 197 (1979); *United States v. Fowler,* 476 F.2d 1091, 1092 (7th Cir.1973).

■ As a general matter, the Fifth Amendment privilege against compelled self-incrimination is not self-executing; "it may not be relied upon unless it is invoked in a timely fashion." *Roberts v. United States,* 445 U.S. 552, 559, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980). The *Miranda* warning of the right to remain silent is a limited exception to this general rule; it doesn't "apply outside the context of the inherently coercive custodial interrogations for which it was designed." *Id.* at 560, 100 S.Ct. at 1364.

D.F. did not invoke her privilege against self-incrimination.[26] On the other hand, she was not provided with any *Miranda* warnings. Thus, D.F.'s privilege against self-incrimination was violated if and only if she was subjected to "custodial interrogation" for the purposes of *Miranda*.

D.F. makes a strong argument both that she was in custody and that the "therapy" to which she was subjected was the functional equivalent of interrogation. Clearly, her freedom of action was curtailed in a significant way. *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). Moreover, it could be argued that she was subject to the functional equivalent of express questioning during her therapy sessions. *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). Certainly, the staff at the center should have known that their practices were "reasonably likely to elicit an incriminating response" from D.F. *Id.* at 301, 100 S.Ct. at 1689.

The Court in *Miranda* was concerned with changing police procedures. It described its concerns over atmospheres that are "police-dominated". *Miranda,* 384 U.S. at 456, 86 S.Ct. at 1618. It illustrated the problem it was addressing through extensive reference to police manuals. *Id.* at 448–55, 86 S.Ct. at 1614–17. Most importantly, it created a bright-line rule that could be easily translated to police manuals and police training sessions. *Id.* at 479, 86 S.Ct. at 1630.

Courts have been reluctant to expand the *Miranda* requirements to questioning by officials outside the law enforcement community.[27] Whether this reluctance is explained in agency terms, *see, e.g., United States v. Eide,* 875 F.2d 1429, 1433–44 (9th Cir.1989); *United States v. Webb,* 755 F.2d 382, 391–92 (5th Cir.1985); *United States v. Capra,* 501 F.2d 267, 282 n. 4 (2d Cir.1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670

**26.** D.F. did invoke her privilege against self-incrimination on April 22. (Ex. 12.) Any statements made after that time could be suppressed on that basis.

**27.** At first glance, the logic behind the Supreme Court's opinion in *Estelle v. Smith,* 451 U.S. 454, 466–67, 101 S.Ct. 1866, 1874–75, 68 L.Ed.2d 359 (1981), would appear to apply equally to the instant case. In that case, the Court held that the results of a court-ordered psychiatric examination could not be used as affirmative evidence to persuade a jury to return a sentence of death. *Id.* As in *Estelle,* during therapy sessions, D.F. was clearly "not in the presence of [a] perso[n] acting solely in ... [her] interest." *Id.* at 467, 101 S.Ct. at 1875 (citing *Miranda v. Arizona,* 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d

694 (1966)). I am reluctant to apply *Estelle* here, however, for at least three reasons: first, in *Estelle,* the defendant was clearly in custody (he was in prison); second, the psychiatrist in *Estelle* was working directly for law enforcement; third, as a practical matter, because of the direct law enforcement involvement in *Estelle,* requiring warnings still served the fundamental purpose of *Miranda* (albeit in a new context).

The court notes, however, that in a case similar to the one at bar, a juvenile counselor who was required to report any confessions to the police was considered "an instrument of the police," and thus, a juvenile who had confessed to him was entitled to *Miranda* warnings. *See Commonwealth v. A Juvenile,* 402 Mass. 275, 521 N.E.2d 1368, 1370–72 (1988).

(1975); *United States v. Antonelli,* 434 F.2d 335, 336–37 (2d Cir.1970); *Corngold v. United States,* 367 F.2d 1, 5 (9th Cir.1966), in custody terms, *see, e.g., United States v. Rucker,* 435 F.2d 950 (8th Cir.1971); Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 6.10(c) (1984 and Supp.1991) (suggesting that most of the agency cases could also be explained in terms of custody), or in interrogation terms, *see, e.g., United States v. Morales,* 834 F.2d 35, 38 (2d Cir. 1987), it ultimately comes down to a reluctance to apply a bright-line prophylactic rule to situations where there is no direct law enforcement involvement.

Imposing a *Miranda* requirement on the staff at the Center would be inconsistent with the motivations behind *Miranda*'s essentially inculcative approach.[28] The history of abuse that motivated the Court in *Miranda* is conspicuously absent here. The court is not aware of any widespread pattern of overreaching by mental health officials seeking to elicit confessions. Moreover, any requirement that the court might fashion here would be anything but bright-line. Thus, the court will not decide this case on *Miranda* grounds.

### III

D.F. also argues that use of her statements against her would violate the Due Process Clause of the Fifth Amendment. In his recommendation, the Magistrate did not address this aspect of D.F.'s motion.

▮▮▮▮▮ The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." The guarantees of due process apply to juvenile proceedings. *Gault,* 387 U.S. at 30, 87 S.Ct. at 1445. The admission of involuntary confessions violates due process. *See, e.g., Miller v. Fenton,* 474

U.S. 104, 109–10, 106 S.Ct. 445, 449–50, 88 L.Ed.2d 405 (1985).

▮▮▮▮▮ "[A] confession will be adjudged 'voluntary' if the government demonstrates that under the totality of the circumstances and by a preponderance of the evidence that it was not secured through psychological or physical intimidation but rather was the 'product of a rational intellect and free will.'" *United States v. Montgomery,* 14 F.3d 1189, 1194 (7th Cir.1994). *Cf. Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960); *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961).[29] The "crucial question" is whether the defendant's will was overborne at the time he confessed, "and the answer lies in whether the authorities obtained the statement through coercive means." *Montgomery,* 14 F.3d at 1194. In deciding this question, the court must consider both "the characteristics of the accused and the details of the interrogation in determining whether a reasonable person would feel coerced." *Id.* at 1194–95. In reviewing the totality of the circumstances, the court may look at a number of factors, including "the age of the defendant, his lack of education or low intelligence, the lack of any advice to him of his constitutional rights, the length of his detention, the repeated and prolonged nature of the questioning, and the use of physical punishment." *Id.* at 1194–95.

The Government argues that, as a threshold matter, D.F.'s statements were not involuntary because there is no evidence that they were brought about by police overreaching. In *Colorado v. Connelly,* the Supreme Court, in reversing the Colorado courts' suppression of a confession as involuntary, held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process

---

**28.** At least with respect to the admissions that D.F. made to Ms. K. on April 5. It is possible that such *Miranda* warnings should have been given after April 16, when Ms. K. began "cooperating" with the F.B.I. Given the nature of the court's holding in Part III, I need not decide that issue.

**29.** "Its essence is the requirement that the State which proposes to convict and punish an individ-

ual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe v. Connecticut,* 367 U.S. 568, 582, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961) (citing, among other authorities, *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)).

Clause of the Fourteenth Amendment." 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986). The Government argues that, because the police were not directly or indirectly involved in eliciting D.F.'s statements, those statements cannot be considered involuntary under *Connelly*.

This narrow reading of *Connelly* misses the point. At first blush, the language of the opinion appears to suggest a narrow police or law enforcement focus. *See Connelly*, 479 U.S. at 163–65, 107 S.Ct. at 519–20. Upon closer scrutiny, however, the opinion and facts of the case suggest otherwise. In *Connelly*, the Colorado Supreme Court had found that, because of the defendant's mental state at the time, his confession had not been "the product of a rational intellect and free will." *Id.* at 162, 107 S.Ct. at 519. As a result, the confession was deemed "involuntary," notwithstanding the fact that the case involved no government wrongdoing or coercion. *Id.* The Supreme Court reversed, holding that government coercion or overreaching was a necessary prerequisite to an involuntariness finding:

> The difficulty with the approach of the Supreme Court of Colorado is that it fails to recognize the essential link between the coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other. The flaw in respondent's constitutional argument is that it would expand our previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that the governmental conduct coerced his decision.

*Id.* at 165–66, 107 S.Ct. at 521. The Court in *Connelly* simply wanted to make it clear that confessions unaffected by outside governmental coercion or coerced by private citizens should not be suppressed as involuntary.

The Government's reading of *Connelly* would, in this court's view, lead to absurd results. State legislators could enlist government employers, welfare workers, and mental health workers as surrogate interrogators by setting up mandatory reporting requirements.[30] As long as the police had no involvement in this enlistment, Due Process protections would not bar the use of any incriminating statements. Such an approach simply does not pass muster in today's world. Just as the courts have recognized that the Constitution protects against psychological, as well as physical coercion,[31] so must they recognize that in this day of extensive government involvement in people's lives, State coercion is not the exclusive province of the police department.[32]

■ I do not mean to suggest that *Connelly* does not require a threshold inquiry into State coercion. I only suggest that that inquiry can go beyond the actions of traditional "law enforcement" personnel[33] to the actions of the juvenile court system, the legislature, other government officials, and the reasonable feelings of the defendant.

■ In the instant case, that inquiry reveals the necessary official coercion, "the essential link between the coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other."[34] *Connelly*, 479 U.S. at 165, 107 S.Ct. at 520–21. Clearly, this case involves coercion—

---

**30.** In fact, under the Government's reading, *Connelly* would bar an involuntariness finding in the instant case even if the Wisconsin reporting requirements were mandatory.

**31.** *See Spano v. New York*, 360 U.S. 315, 321, 79 S.Ct. 1202, 1206, 3 L.Ed.2d 1265 (1959).

**32.** This is not inconsistent with the court's reluctance to find the necessary official action here to trigger *Miranda*. *See supra* Part II. Given the history and motivation behind the *Miranda* warnings, certain State action can trigger due process protections without triggering *Miranda* protections. *See, e.g., United States v. Goldberger*, 837

F.Supp. 447, 452–53 (D.D.C.1993) (no *Miranda* required because no custody, but confession found involuntary).

**33.** I.e., police, other criminal investigators, and prosecutors.

**34.** Initially, the court notes that given the close relationship between staff at the Center and Protective Services, the juvenile court system, and the F.B.I., the agency relationship that the Government reads into *Connelly* may in fact exist. Given the foregoing analysis, however, the court need not decide that question.

indeed, a bit of overreaching—by government officials. Staff members at the Center were either enlisted or volunteered[35] to act as law enforcement surrogates in eliciting confessions from troubled teens. There is extensive evidence in the record of the close relationship between staff at the Center and Protective Services, the juvenile court system, and the F.B.I. There is also evidence that many of the staff at the center saw themselves as an arm of law enforcement. Moreover, it would be totally reasonable for a child of D.F.'s age, intelligence, and mental state to believe that she was being "encouraged" to talk by, effectively, law enforcement personnel.

 As a result, I must consider whether D.F.'s confession was "voluntary." As I noted above, that determination must be made based on the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. *Montgomery*, 14 F.3d at 1194–95. Ultimately, the court must determine whether D.F.'s will was overborne at the time she confessed. *Id.* at 1194. Because D.F. was a juvenile at the time of her confession, the court must exercise "great care . . . to insure the voluntariness" of her confession. *Woods v. Clusen*, 794 F.2d 293, 298 (7th Cir.1986) (citing *Haley v. Ohio*, 332 U.S. 596, 601, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948)); *cf. Gault*, 387 U.S. at 55, 87 S.Ct. at 1458.

D.F., a deeply disturbed girl of 13, was admitted against her will into a program at a locked facility in [redacted] County. She suffered from a pervasive mistrust of authority figures. Staff at the Center went to great lengths to encourage and develop her trust. They also employed a wide range of tactics to "encourage" her to talk about the crimes she had committed. Privileges were accorded based on, among other things, frank admission of crimes. Criminal admissions were forgiven subject to continued cooperation and disclosure. Individual staff questioned D.F. directly about her past crimes. Protective Services Staff were provided with information about her crimes, and were allowed to question her about further crimes.

Staff at the Center were aware that D.F. was suspected of playing a role in her cousins' deaths. They felt that she needed to talk about her involvement, both for therapeutic and punitive reasons. Consequently, they "encouraged" her to talk about it.

D.F. resisted this "encouragement" for four months. This may or may not have been due to the statements of certain staff, who warned D.F. that they might have to "report" any incriminating statements she made. There is no evidence, however, that D.F. was ever fully warned of the consequences of a confession. Moreover, the evidence suggests that the warnings were minimal, and that, in any event, they never included any mention of D.F.'s Fifth Amendment privilege of self-incrimination.

Finally, in April 1993, D.F. confessed to killing her two young cousins. Staff immediately reported the confession to Protective Services, and later cooperated with the F.B.I.'s investigation. At the same time, staff pressured D.F. to repeat and expand upon her confession, even after she had retained an attorney and invoked her Fifth Amendment privilege against self-incrimination. As a result, D.F. made a number of additional incriminating statements in the ensuing weeks.

 After considering the totality of the circumstances, I conclude that D.F.'s inculpatory statements were secured through psychological coercion and were not the "product of a rational intellect and free will." *Blackburn*, 361 U.S. at 208, 80 S.Ct. at 280. Given the circumstances under which they were employed, the various "encouragement" techniques employed by the staff were highly coercive. A reasonable person of D.F.'s age, intellect, and mental state would have felt coerced. In sum, D.F.'s confession was not "voluntary" within the meaning of the Due Process Clause of the Fifth Amendment.

---

**35.** Whether one thinks the staff members were enlisted by the state or volunteered depends upon one's reading of the Wisconsin reporting provisions. As I discussed earlier, I am not convinced that the Wisconsin reporting provisions permit disclosure of confessions such as D.F.'s.

## Conclusion

For the reasons set forth above, the court finds that Government use at trial of statements made by D.F. in the course of her therapy would violate the Due Process Clause of the Fifth Amendment. Accordingly,

**IT IS ORDERED** that D.F.'s motion to suppress evidence be and the same is hereby **GRANTED.** All statements made to any counselor, therapist, or treatment worker at the [redacted] County Mental Health Center are hereby suppressed.

## RECOMMENDATION TO THE HONORABLE J.P. STADTMUELLER AND ORDER

GOODSTEIN, United States Magistrate Judge.

Two infant children, sisters, were tragically found dead in their parents' house six days apart. The medical examiner attributed the first death to Sudden Infant Death Syndrome and the second death to influenza. A subsequent opinion offered by a different medical examiner found both deaths to be consistent with suffocation. On November 17, 1993, the United States filed a two count information charging D.F., a juvenile, in each count with murder in the second degree, in violation of 18 U.S.C. § 1111, 1153 and 5031. D.F. made an initial appearance before this court on November 18, 1993. A delinquency hearing is scheduled before Judge J.P. Stadtmueller on April 25, 1994, with a final prehearing conference to be conducted on April 20, 1994. Currently pending before the court are D.F.'s motions to suppress evidence, motion for a jury trial and motion for notice of uncharged misconduct evidence. The motions have been fully briefed and are ready for resolution.

### Motion to Suppress Statements

D.F. moves to suppress all statements which were made to any counselor, therapist or treatment worker attributed to D.F. while she was confined in the [redacted] Mental Health Center. The court conducted an evidentiary hearing regarding this motion commencing February 3, 1994. Testifying at the hearing were treatment counselors B.K. and R.M., registered nurse P.S., and nursing assistants L.B., S.A., D., S.V. and D.M. All of these witnesses were employed by the [redacted] Mental Health Center during the period of D.F.'s treatment.

The parties have agreed upon many of the underlying facts, and the court commends the parties for their extensive efforts in this regard. The court would further note that the testimony presented few, if any, factual disputes. Rather, the dispute between the parties focuses upon the significance of the events which transpired. The court makes the following findings of fact:

At all times relevant to the suppression motion, D.F. was a juvenile, thirteen to fourteen years of age. On December 4, 1992, D.F. was admitted to the locked adolescent unit of the [redacted] Mental Health Center where she resided at all times relevant to the suppression motion. Her admission was voluntary, although she was under court supervision at the time, and a condition of her supervision was that she cooperate with recommended counseling; had she not been voluntarily admitted, she may have been ordered into treatment.

The conditions of confinement have certain similarities to a low security custodial setting. The clients are not permitted to leave the adolescent unit freely, although they may generally move about within the unit. The clients are outside of the unit on many occasions, including visits to the main dining room and the school. At the age of thirteen, D.F.'s guardian could sign her out for up to four hours if approved; after turning fourteen on March 17, 1993, D.F. could sign herself out for this period, if approved. A client can leave permanently, but only after a forty-eight hour waiting period which allows the medical director an opportunity to seek involuntary placement under Wisconsin law. After returning from a pass, clients are subjected to strip searches for contraband. At various times, a client might be confined to her room for disciplinary reasons or, when suicide prevention is a concern, may not be allowed out of the unit unescorted.

R.M. is an Alcohol and Drug Abuse Counselor at the facility. On December 11, 1992, M. met with D.F. and explained the rules and procedures regarding matters of confidentiality. At the time of D.F.'s admission, the [redacted] Mental Health Center was developing its policies with regard to informing patients of matters relating to child abuse which would not be kept confidential. M. explained to D.F. that "any information about suspected child abuse or neglect ..." was not protected by confidentiality. D.F. acknowledged this in writing and M. testified that D.F. did not appear to have any difficulty understanding this explanation. *See* Exhibit B–1.

During the next week, M. was in contact with N.M., a caseworker from the [redacted] County Department of Human Services, regarding D.F.'s sexual activity with adult men. During their discussions, M. told M. that D.F. was suspected in the death of two of her cousins and that there were also concerns of D.F. being violent toward other cousins, breaking arms or legs. M. was advised that nothing had ever been proven and the deaths were attributed to Sudden Infant Death Syndrome or influenza. Exhibit B–2.

M. testified that this information caused him to have a heightened sensitivity to the issues of confidentiality and reporting. At this point in time, M. believed that any information concerning the abuse of a juvenile, either a juvenile patient who was the subject of abuse or a patient who caused the abuse of a juvenile, had to be reported to the authorities. Consequently, M. made a point of telling D.F. that any disclosures about hurting or killing a child would have to be reported to Protective Services and ultimately to law enforcement. To this end, M. told D.F. that she should be cautious about what she said, and that it was her choice to not speak about any incidents. M. estimated that he warned D.F. approximately ten times and recorded notes about his warnings in her chart about four times. *See e.g.*, Exhibits A–1, B–4.

D.F. was aware that her admissions would be reported and for several months she avoided disclosing her actions. On January 7, 1993, for instance, D.F. was asked if she had ever murdered anyone and responded, "I can't answer that." Defense Exhibit 11. On January 8, 1993, D.F. was asked if she had ever murdered anyone and she did not respond. Exhibit B–3. Around the same time, she told staff members that if they knew all the people she had hurt it would get her in trouble. Tr. 239. Another time she told her aunt that if everything she had done were disclosed she would have to go to jail for a long time. Exhibit B–4. On March 17, 1993 D.F. told a staff member, when encouraged to talk with staff, "I can't. You have to report what I say." Exhibit C–5.

Despite D.F.'s reluctance to discuss her past actions, the staff continued its efforts to have D.F. truthfully verbalize her past conduct. Ultimately, over a period of time, D.F. made limited disclosures about her past conduct and alluded to the severity of her conduct. For instance, on January 1, 1993, D.F. was instructed by a Person In Charge ("PIC") for a particular shift to make a list of all the people she had hurt in the past, which was embodied in Exhibit C–3. See also Exhibit D–1. After D.F. disclosed that she broke her cousins's arm, D.F. was told, on March 2, 1993, that a tentative decision had been reached by the [redacted] County Human Services Department to refrain from charging D.F. for this act of violence toward her cousin if D.F. continued to make treatment progress.

On April 5, 1993, she made a specific statement regarding her fatally assaultive behavior toward her two [redacted]. This was followed by several similar disclosures over the next several weeks. D.F.'s disclosures regarding her [redacted] appear to have been a culminating response to continuing urging and encouragement she was given as part of her treatment by the hospital staff to fully disclose the wrongs of her past.

D.F.'s treatment program had several express objectives, including to develop trust and avoid telling lies. To this end, the clients are given a variety of incentives to discuss personal matters. For instance, each client is instructed to have at least one contact with the PIC for a particular shift. Failure to initiate a contact or to follow instructions could result in either the loss of points or the award of fewer points under a point

based incentive system. Likewise, the clients were awarded or assessed points for their participation in group sessions. The loss of points could lead to the loss of various privileges, or to disciplinary measures such as "Base 0," in which the client was confined to her room for a period of time, had to dress in her hospital robe and complete a particular reading and writing assignment.

D.F.'s disclosure on April 5, 1993 occurred while D.F. was participating in a group session with other juveniles, led by B.K. The juveniles in the group were discussing serious things they had done in their lives. One of the group was discussing an incident and the others in the group were telling him that he should be more honest. D.F. responded by saying words to the effect of "Oh, you think what you did is bad, let me tell you what I did ..." D.F. proceeded to disclose details of the events surrounding the two deaths.

On April 6, 1993, the staff conducted a meeting in which K. told the persons present about D.F.'s disclosures. D.V., a liaison from the Department of Social Services, went, without any staff discussion, to the telephone and reported D.F.'s disclosures to Protective Services. The matter made its way through various channels and ultimately, the F.B.I. initiated an investigation.

Meanwhile, there were ongoing discussions amongst the staff as to whether this matter should have been reported, in what fashion and what level of cooperation was appropriate. Initially it was believed that there was no choice under Wisconsin law but to report D.F.'s disclosures. Around April 16, 1993, however, K. learned that the confidentiality and reporting law, Sec. 48.981, Wis.Stat. does not mandate, but may permit, reporting when a juvenile discloses that she was the perpetrator of abuse. Reporting is only mandatory to the extent that a juvenile admits being the victim of abuse.

In the days and weeks which followed, D.F. continued to discuss the deaths with the treatment staff on various occasions. On April 22, 1993, K. was contacted by an attorney in [redacted] who had been appointed to be D.F.'s public defender. K. was present when the attorney spoke with D.F. and told D.F. not to speak with anyone about the case—either law enforcement or tribal authorities. D.F. signed a statement indicating that she did not want to speak with anyone unless her attorney was present. Defendant's Exhibit 12.

The infants' deaths were the topic of discussion between K. and D.F.'s family on April 23, 1993 and again on May 10, 1993. Exhibit A–6, A–8. As of April 23, 1993, K. was considering the appropriate level of cooperation with the F.B.I. and advised the family to "keep discussions of the death confined to the session, so that they could be protected by confidentiality."

*Analysis*

The parties focus upon the issue of whether the admission of D.F.'s statements would be in violation of the Fifth Amendment and her rights under *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). D.F. contends that over the course of her treatment she was not free to leave, that the treatment staff were acting as agents of the police in memorializing and reporting incriminating statements and that the course of her treatment constituted interrogation, intending to get her to make inculpatory admissions. The government contends that her statements were voluntary disclosures made free from any coercive effects and that, although D.F. was never advised of her *Miranda* rights, she was not subjected to custodial interrogation by law enforcement which would invoke the protections of *Miranda* and the sanctions of the exclusionary rule.

A person in custody must be informed, prior to interrogation, of her right to remain silent and to have a lawyer present. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). In a conventional context, *Miranda* deals with the interrogation of an accused, alone in an investigator's office, in which the "atmosphere suggests the invincibility of the forces of the law." 384 U.S. at 449–50, 86 S.Ct. at 1614–15.

The present case is not the conventional context of interrogation. However, the juvenile contends that the entire five month

course of her residential treatment in the locked adolescent unit of the Mental Health Complex was equivalent to custodial interrogation and therefore, the safeguards of *Miranda* apply.

This is a case about privilege; the privilege of communications which may arise between a patient and a psychotherapist, and in a related sense, the privilege against self-incrimination. Unquestionably, this case presents a tragic situation. Two infants are dead, and their family grieves. D.F.'s background and present circumstances are also tragic. At a minimum, she has very serious emotional and psychological problems. From a legal standpoint, the case implicates rights which are the very foundation of our constitution. As stated in *Miranda*, 384 U.S. at 460, 86 S.Ct. at 1620 (citations and internal quotations omitted), the privilege against self-incrimination,

> developed as one which groped for the proper scope of governmental power over the citizen ... the privilege has come rightfully to be recognized in part as an individual's substantive right, a right to a private enclave where he may lead a private life.... [T]he constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a fair state—individual balance, to require the government to shoulder the entire load ... to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel simple expedient of compelling it from his own mouth.

D.F. was in a treatment setting because she had demonstrated significant problems in her psychological development. Communications between a patient and a psychotherapist in a treatment setting typically involve far more intensely personal information than communications to other kinds of doctors, *Doe v. Diamond*, 964 F.2d 1325, 1328 (2d Cir.1992), delving into matters at the core of the human personality. It is notable that *Miranda* was principally directed toward the use of psychological, not physical, factors involved in an interrogation, toward protecting the "inviolability of the human personality." *Miranda*, 384 U.S. at 460, 86 S.Ct. at 1620. This unique case presents an unusual convergence between the privilege against self incrimination and the privilege of communications between a psychotherapist and patient.

The parties focus solely upon the privilege against self incrimination. At the outset of the hearing, counsel for the juvenile indicated that the privilege question would be reserved for a motion in limine, but the facts elicited at the evidentiary hearing compel the court to start with the question of a psychotherapist-patient privilege. The court regrets that it does not have the benefit of the parties' briefing as to this issue, but given the unusual interplay of privileges and the facts of this case, the court must address the matter at this juncture.

Rule 501, Fed.R.Evid., provides that "the privilege of a witness [or] person ... shall be governed by the principles of common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness [or] person ... shall be determined in accordance with State law."

Although a juvenile is protected by many safeguards found in the criminal justice system, a juvenile proceeding is generally regarded as civil, not criminal in nature. *United States v. Parker*, 956 F.2d 169, 171 (8th Cir.1992); *United States v. Furey*, 500 F.2d 338, 342 (2nd Cir.1974). On this basis alone, and taking into account issues of comity as well as the much greater experience of state courts in juvenile matters, the court believes that state law appropriately provides the rule of decision. See generally, *Memorial Hospital for McHenry Co. v. Shadur*, 664 F.2d 1058, 1061 (7th Cir.1981) ("A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges"); *United States v. Juvenile*, 599 F.Supp. 1126, 1130 (D.Or.1984) (federal court system is ill equipped to meet the needs of

juvenile offenders and deference to the state courts is appropriate).

Parenthetically, in the context of criminal proceedings, the Seventh Circuit has said that a court must decide, "in the light of reason and experience," whether any privilege applies to a particular case. *United States v. Wilson*, 960 F.2d 48, 50 (7th Cir. 1992). If this were regarded as a criminal case, to determine whether to recognize the privilege the court must balance, on a case by case basis, the purpose the privilege is meant to serve against the federal interests served by allowing the government to use the evidence. *Id.* *United States v. Diamond*, 964 F.2d 1325, 1328 (2d Cir.1992) (finding a psychotherapist-patient privilege may exist on a case by case basis, collecting cases and noting that forty-nine states have adopted some form of a psychotherapist-patient privilege); *United States v. Burtrum*, 17 F.3d 1299, 1302 (10th Cir.1994) (denying privilege on policy grounds).

Applying state law as the rule of decision for privilege as it exists in Wisconsin, Sec. 905.04(2), Wis.Stats., provides that "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of ... diagnosis or treatment of the patient's physical, mental or emotional condition, among the patient ... the patient's psychologist, the patient's social worker, the patient's marriage and family therapist, the patient's professional counselor or persons, including members of the patient's family, who are participating in the ... diagnosis or treatment under the direction of the physician, registered nurse ... psychologist, social worker, marriage and family therapist or professional counselor."

Section 905.04(1)(b), Stats., provides: "A communication ... is 'confidential' if not intended to be disclosed to third persons other than those present to further the interest of the patient ... or persons who are participating in the diagnosis and treatment under the direction of the physician, registered nurse ... psychologist, social worker, marriage and family therapist or professional counselor, including the members of the patient's family."

D.F. was working on several goals in therapy, including to develop trust and avoid telling lies. To this end, D.F. was encouraged to make full disclosures to the treatment staff of the matters with which she had difficulties. Although D.F. had been cautioned that certain information regarding abuse would be reported, this does not equate to a voluntary intent, or even acquiescence, that it be reported. The government has argued that the disclosures were made not in response to interrogation by staff, but rather as part of therapy. Accepting this as true, it is clear that D.F.'s intent was similarly therapeutic, not to have the information conveyed to the police, but to demonstrate to the staff that she was developing a trust in them by making certain disclosures. In fact, K. testified that D.F.'s statements were confidential client statements and advised the family to "keep discussions of the death confined to the session, so that they could be protected by confidentiality." *See also,* Exhibit F–1 ("upset about peer's lack of keeping her confidentiality from group last week ...").

The court is aware of an unreported Wisconsin Court of Appeals case which is factually very similar to the present case. *State v. Todd F.M.*, 178 Wis.2d 877, 506 N.W.2d 427, (Ct.App.1993). Although it is of no precedential value, the reasoning is sound and provides insight into the workings of the relevant Wisconsin Statutes. In *Todd*, a juvenile was being treated for sexual contacts he had with other juveniles. During treatment he was encouraged to accept responsibility for his behavior and to be forthright about his conduct. During the course of treatment he disclosed other sexual contacts with children and wrote a number of letters admitting these contacts. The government sought to introduce these admissions against Todd, but the trial court suppressed them as privileged communications. The Court of Appeals upheld the trial court's decision in an unpublished decision.

The court in *Todd* notes that Section 905.-04(4)(e), Wis.Stats. provides for an exception to what would otherwise be privileged com-

munications where "the examination of an abused or injured child creates a reasonable ground for an opinion ... that the condition was other than accidentally caused or inflicted by another." This exception conforms to the mandatory reporting requirement under Sec. 48.981(2), Wis.Stats. which requires the reporting of victims of abuse. As the court in *Todd* notes, "it is clear that the abused or injured child exception applies to victims of abuse and not to perpetrators. The statute's intent is to facilitate reporting of child sexual abuse for the benefit of sexual abuse victims by identifying incidents of abuse and initiating intervention." *State v. Todd F.M.*, 178 Wis.2d 877, 506 N.W.2d 427. This court concurs with the reasoning in *Todd*, that the perpetrator's communications are not excepted from the privilege under Section 905.-04(4)(e), Wis.Stats. The court therefore concludes that D.F.'s communications are privileged.

The treatment staff acknowledges that they were under the erroneous impression that the Wisconsin Statutes required them to report abuse when the "child seen in the course of professional duties," is the perpetrator of the abuse. Sec. 48.981(2), Wis. Stats. Even if the statute, Sec. 48.981 Wis. Stats., permitted the treatment staff to report abuse to a child, the report is for the benefit of the victim of abuse. Neither Sec. 905.04(4)(e), Wis.Stats. nor Sec. 48.981 Wis. Stats. contain any express provision for waiving the perpetrator's privilege of communications.

Moreover, without limitations on the use of the information, a requirement that the psychotherapy treatment staff provide law enforcement with a confession made by a juvenile perpetrator of abuse would, in effect, conscript all treatment workers into service as skilled agents of law enforcement, capable of obtaining confessions through psychological means. This is, in effect, what occurred in this case. In fact, B.K. testified that she carefully documented D.F.'s disclosures, at least in part, because she thought she might have to testify as to these statements in court. Likewise, when D.V. placed the telephone call to report D.F.'s confession, there was no advance discussion as to whether this would be proper or in D.F.'s best interest. Since the abuse victims were deceased, the ostensible reason in reporting appears to have been to serve law enforcement purposes. In fact, M. testified that some members of the treatment staff believed that D.F. would not be capable of real healing until she went through the catharsis of court proceedings.

It thus appears that the treatment staff had a dual purpose; the purifying act of D.F. first admitting to her ill deeds and then accepting and suffering the consequence of her acts. In this sense, the treatment staff acted as if they were agents of law enforcement. *See generally, United States v. McAllister*, 18 F.3d 1412, 1417–18 (7th Cir.1994) (For fourth amendment purposes, whether a person was acting as a government agent depends initially upon "whether the government knew of and acquiesced in the intrusive conduct," and secondly "whether the private party's purpose ... was to assist law enforcement efforts or to further his own ends."); *quoting, United States v. Feffer*, 831 F.2d 734, 739 (7th Cir.1987); *see also, Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (statements made by a defendant during a state ordered psychiatric examination not admissible without *Miranda* warnings).

The court notes that D.F. was given very mixed, and seemingly conflicting, signals about her disclosures. She was told that abuse she disclosed had to be reported, but she was also told that her communications were confidential. She was encouraged to be forthright in her disclosures and when she disclosed non-lethal violent acts toward some of her cousins, she was told no charges would be brought if she continued her therapy. There is no question that the treatment staff believed, from a therapeutic standpoint, that it was necessary for D.F. to admit her wrongdoings. To this end, the staff facilitated and encouraged her to make disclosures, such as the list, Exhibit C–3, of all the people she had hurt or the inquiry, on January 8, 1993, as to whether D.F. had ever murdered anyone. Exhibit B–3. In this sense, D.F. was subjected to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct.

1682, 1689–90, 64 L.Ed.2d 297 (1980) (interrogation includes "any words or actions ... reasonably likely to elicit an incriminating response from the suspect").

Undoubtedly to D.F.'s therapeutic benefit, this was an effective setting in which to wear down her resistance and gain her confidence. While most confessions may be therapeutic, an individual still retains a constitutional right to be free from self incrimination. D.F.'s progress notes are telling:

12/22/92—[D.F.] stated "I just have a real problem trusting people enough to tell them what my problems are." Writer reassured client that maybe she should try [to] trust staff. (Def.Exh. 8)

1/9/93—Still talked about not trusting or getting close to people because when you trust people you end up getting hurt. (Def.Exh. 2)

4/17/93—[D.F.] asked writer, "you know I'm going to court, right?" I stated yes. She then asked what am I going to say when they ask[ ] me why I did it? "I told her just to tell the truth and explain exactly how you felt and exactly how you did it."

It is clear that over time, D.F. grew to trust members of the treatment staff and confide in them. There is no question that D.F.'s trust was essential from a therapeutic standpoint and D.F. revealed many, if not all, of her darkest secrets in therapy. Some of the secrets revealed pertain to the current charges.

In describing the psychological factors contributing to a successful interrogation, the Court in *Miranda* specifically noted that the objective of the police is to "persuade, trick, or cajole [the subject] out of exercising his constitutional rights." *Miranda*, 384 U.S. at 455, 86 S.Ct. at 1617. The method was described:

"To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed.

To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings.... [T]he interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover, his family and other friends are nearby, their presence lending moral support."

*Miranda*, 384 U.S. at 449–50, 86 S.Ct. at 1615 (emphasis added)

The facial similarities between inpatient psychotherapy and the interrogation tactics discussed above give this court pause. In this sense, this case becomes most disturbing when considering D.F.'s statements on April 23, 1993 and again on May 10, 1993, in which K. advised the family to "keep discussions of the death confined to the session, so that they could be protected by confidentiality." Regardless of whether K. intended to be deceptive, the government now seeks to introduce these statements against D.F. Notably, these statements were made following D.F.'s written invocation of her *Miranda* rights.

The court does not mean to ascribe any ill faith to the treatment staff. Rather, the court means to highlight the fine line, at least in this case, between D.F.'s Fifth Amendment privilege against self incrimination and her privilege of communications between psychotherapist and patient.

As stated at the outset of this discussion, this case does not present the conventional context of interrogation. Specifically, *Miranda* and its exclusionary sanctions are to be applied when an accused is in custody or otherwise deprived of her freedom of action

in any significant way. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. The courts which have considered situations amounting to custody look at such factors as the duration of the confinement, the familiarity of the setting and the control exercised by the accused. *See United States v. Hocking,* 860 F.2d 769, 772 (7th Cir.1988) (interview conducted at home); *United States v. Willoughby,* 860 F.2d 15, 23–24 (2d Cir.1988) (inmate not in "custody" when the inmate initiated the meeting, initiated conversations about crime, could terminate interview and no evidence of compulsion beyond the fact of confinement). *Schiro v. Clark,* 963 F.2d 962, 974 (7th Cir. 1992) (halfway house setting not custodial); *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (routine meeting between defendant and his parole officer not considered to be custodial interrogation).

D.F. was only fourteen at the time of her admissions, and had spent several months in the treatment setting where counselors worked with her to establish trust and feel comfortable revealing her inner most secrets. Her surroundings were undoubtedly familiar and D.F. had the ability to leave for limited periods of time. Nevertheless, she had significant restrictions on her freedom. D.F. knew that she would not be allowed to live at home unless she completed treatment with some degree of success and would be, in effect, penalized for keeping to herself and not opening up. The one time D.F. tried to sign herself out she was persuaded not to prior to the lapse of the 48 hour waiting period. It was essentially beyond D.F.'s ability to terminate her treatment and, to a fourteen year old, the restraints on D.F.'s freedom undoubtedly seemed significant.

Nevertheless, "juveniles, unlike adults, are always in some form of custody." *Schall v. Martin,* 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984). Typically, a juvenile would be in the "custody" of her parents, bound to submit to the authority of a parent. If the court takes a broad view of D.F.'s confinement, she was subjected to a loss of liberties and terms of confinement for an extended period of time, and made to submit, in a sense, to the authority of the treatment staff. This court is unwilling to say, however, that she was in custody in the traditional context of *Miranda* simply by virtue of her placement in an adolescent wing. In fact, each statement was elicited in a familiar setting, comfortable enough that D.F. felt willing to "open up" to the staff.

The pervasive aspect of this case is the psychological treatment; treatment structured to elicit confession-like responses. For that reason, the court believes that this case is most properly decided as a question of psychotherapist-patient privilege, although the privilege takes on added importance because of the Fifth Amendment underpinnings. This court declines to recommend that the statements be suppressed on the basis of *Miranda v. Arizona,* but finds that permitting the introduction of D.F.'s statements in evidence against her would violate the psychotherapist-patient privilege. It is therefore recommended that the statements made by D.F. to the treatment staff be suppressed.

### *Motion for a Jury Trial*

D.F. has requested a jury trial on the two delinquency charges. The Sixth Amendment provides criminal defendants the right to trial by an impartial jury. However, in *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) a plurality of the Court found that a juvenile did not have a Sixth Amendment right to a jury trial in a juvenile delinquency adjudication. D.F. now asks this court to find that she is entitled to a trial by jury.

D.F. observes that juveniles are increasingly the perpetrators of serious crimes. Society has responded with juvenile detention facilities which have become more prison-like in character and the possibility of terms of incarceration extending past the age of majority. The government points out that much of the original reasoning of the *Court* in *McKeiver v. Pennsylvania,* as to why there was not a right to a jury trial in a juvenile matter, remains sound. Specifically, the government points to factors such as the informal, protective character of a juvenile proceeding and the limit on confinement in this case to the age of twenty-one. *See*

*McKeiver v. Pennsylvania,* 403 U.S. at 545, 550–53, 91 S.Ct. at 1986, 1988–90. The government also observes the many types of cases in which there is no right to a jury trial, most notably perhaps are military trials.

This case will likely pose some difficult factual issues, particularly in the face of what appears to be a factual dispute concerning the cause of the two infants' death. The overarching concern is, of course, that the juvenile receive a fair adjudication in the juvenile's best interest. These proceedings will be delicate and the court is not convinced that the larger venue of a jury trial will further the juvenile's best interests or make for a more fair adjudication of the issues. The decision in *McKeiver v. Pennsylvania,* 403 U.S. at 528, 91 S.Ct. at 1978, may only have been a plurality decision and may be subject to reconsideration, but it is still a binding pronouncement by the Supreme Court on the issue. The court therefore concludes that D.F. does not have a constitutional right to a jury trial. It is Judge Stadtmueller's province to decide whether he might otherwise be amenable to the use of a jury, and D.F.'s motion for a jury trial is therefore denied, without prejudice.

### Motion for Notice of Uncharged Misconduct

D.F. seeks reasonable notice of any uncharged misconduct which the government intends to introduce at her delinquency hearing. The government agrees to provide reasonable notice and the motion is therefore denied as moot.

IT IS THEREFORE ORDERED that:

1. D.F.'s motion for a jury trial is denied, without prejudice. D.F. may renew her motion before Judge Stadtmueller.

2. D.F.'s motion for notice of uncharged misconduct evidence is denied as moot.

IT IS THEREFORE RECOMMENDED that D.F.'s motion to suppress evidence be granted, and her statements made in the course of psychotherapy be suppressed.

Any objection to this order and recommendation must be filed with the Clerk of Court in duplicate prior to the final prehearing conference, which is scheduled to be held on April 20, 1994. Failure to file an objection within the specified time waives the right to appeal the district court's order on all factual and legal issues.

Dated at Milwaukee, Wisconsin, this <u>13th</u> day of April, 1994.